NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-1389                                    Appeals Court


COMMONWEALTH  vs.  JAMES WOOD.


No. 14-P-1389.

Middlesex.     October 7, 2015. - September 16, 2016.

Present:  Katzmann, Rubin, & Wolohojian, JJ.


Assault by Means of a Dangerous Weapon.  Evidence, Illustrative
     exhibit, Best and secondary.  Practice, Criminal,
     Instructions to jury, Argument by prosecutor.



     Indictments found and returned in the Superior Court
Department on March 10, 2011.

     The cases were tried before Sandra L. Hamlin, J.


     Joseph J. Mazza for the defendant.
     Jessica Langsam, Assistant District Attorney, for the
Commonwealth.


     KATZMANN, J.  The defendant appeals from his conviction by

a Superior Court jury of assault and battery by means of a

dangerous weapon causing serious bodily injury (ABDW-SBI). He

challenges the admission in evidence of a compilation of

portions of previously admitted exhibits that had been sequenced

and highlighted by the Commonwealth, and the trial judge's instruction on absence of right or excuse.[1]  We affirm.

Background.  The  jury could have found as follows.  Around 9:20 P.M. on May 16, 2010, Carlos Serpa arrived at Lawrence Memorial Hospital suffering from multiple stab wounds:  one to his back, two to his left leg, and one to his left arm.  He had been driven to the hospital in his own vehicle[2] by his friend Michael Diceglie, who had insisted on securing Serpa medical treatment despite the latter's protestations when he showed up bleeding at Diceglie's front door.  Although neither Serpa nor Diceglie telephoned 911, hospital personnel notified the police as required when a patient presents as a victim of a stabbing. When uniformed officers from the Medford police department arrived, Serpa -- who was on probation following his release from prison on a sentence arising from armed robbery convictions -- told the officers that he was stabbed by an unknown dark-skinned male in dark clothing, who tried to rob him as he was getting out of his vehicle in front of Diceglie's apartment on Myrtle Street in Medford.  The officers considered Serpa's

---

[1] The jury also convicted the defendant of conspiracy to distribute marijuana.  He does not appeal that conviction.  The jury found the defendant not guilty of armed assault with intent to murder and armed assault with intent to rob.

[2] When police later inspected Serpa's vehicle, they observed blood and a bloody shirt on the passenger seat.

answers to their questions to be vague and likely not entirely truthful.

One of the uniformed officers then visited Myrtle Street and located a blood trail, prompting him to secure the crime scene and notify detectives. Medford police Detectives Michael Goulding and Patricia Sullivan arrived at Myrtle Street later that same evening and began investigating the blood trail.

In the meantime, Serpa had been transferred to Massachusetts General Hospital (MGH). After leaving the crime scene on Myrtle Street, Detectives Goulding and Sullivan went to see Serpa at MGH in the early morning hours of May 17, 2010. Serpa told the detectives the same story he had told the uniformed officers at Lawrence Memorial Hospital, that he was attacked by a dark-skinned male in dark clothing as he was getting out of his car.

It was quickly apparent that Serpa's story did not add up. The detectives concluded that the blood trail on Myrtle Street was not consistent with Serpa's account. Neighborhood canvases the evening of the incident and in the days that followed yielded no witnesses who had heard or seen anything unusual that night, despite Serpa's claims that he had yelled for Diceglie and banged on his door after the attack. The detectives were aware that Serpa was wearing a global positioning system (GPS)

monitoring device, an ankle bracelet, as a condition of his probation.

Based on the inconsistencies between the physical evidence and Serpa's account of the stabbing, Detective Goulding subpoenaed cellular telephone records from Serpa's cellular telephone (cell phone) and discovered calls and text messages on the day of the incident between Serpa and a cell phone number registered to the defendant. Goulding then obtained a search warrant for the content of Serpa's text messages. Goulding discovered that a text message from the defendant's cell phone was sent to Serpa around 3:30 P.M. on May 17, 2010, offering Serpa one-half pound of high-quality marijuana on credit. Serpa quickly lined up a buyer, arranging via text message to resell that same one-half pound of marijuana to Diceglie, who was not acquainted with the defendant, at a mark-up.[3] For his service in the transaction, Serpa would pocket $150.

A series of text messages then followed throughout the rest of the day between the defendant's cell phone and Serpa, and between Serpa and Diceglie, in which Serpa finalized plans for both legs of the transaction. Ultimately, arrangements were made in which the defendant and Serpa would meet near Diceglie's

---

[3] The text message sent from the defendant's cell phone to Serpa read: "I can give you a half blue on the sleev to help u some." Serpa's message to Diceglie asked: "u want a half of blue dream?" The meanings of the text messages were decoded at trial.

Medford apartment around 9 P.M., at which point Serpa and the defendant would go together to give Diceglie the marijuana and get their money.

Detective Goulding was also able to track the defendant's and Serpa's movements during the relevant time period to corroborate the planned drug meet. Data from Serpa's GPS ankle bracelet provided his whereabouts leading up to the stabbing, and Goulding obtained cell phone tower location data for the cell phone registered to the defendant for May 16 and May 17. The defendant's cell phone location data showed that his cell phone "hit off" towers in the vicinity of Diceglie's apartment in the minutes before Serpa was stabbed. Although the data indicated that both the defendant's cell phone and Serpa were in the area of Myrtle Street that night, deoxyribonucleic acid (DNA) analysis confirmed that the blood found on the sidewalk, the steps and interior of Diceglie's apartment, and Serpa's clothing and his vehicle came only from Serpa.

On June 16, 2010, one month after the incident and with the stabbing investigation continuing, Detectives Goulding and Sullivan met with Serpa again. They hoped Serpa could provide more information concerning the stabbing. Goulding told Serpa that he knew what had happened that night and that Serpa's story did not add up, but Goulding did not confront Serpa with any of the specific information he had gleaned from the cell phone

calls, texts, and tower location data, nor did he inform Serpa that he had collected any of that information. Serpa, however, stuck to his story, repeating the account of an unknown assailant that he had provided to the police a month before. As a result of the investigation, charges ultimately issued against Serpa and Diceglie for conspiracy to violate the drug laws and witness intimidation for lying to the police who were investigating the stabbing, and Serpa was arrested.

In December, 2010, more than six months after the stabbing, Serpa appeared at court for a probation violation hearing based on the new conspiracy and witness intimidation charges. Serpa, who had recently become a father, faced the possibility of a substantial sentence on the probation violation, in addition to any potential sentences imposed if he was eventually convicted on the new charges. At this point, Serpa broke down, cried, changed his story, and implicated the defendant.

In his testimony at trial, Serpa named the defendant as his attacker the evening of May 16, 2010. Serpa said that when he and the defendant arrived in front of Diceglie's apartment in accordance with their plan to sell the marijuana, they parked on opposite sides of the one way street. Serpa approached the defendant's vehicle, explaining that he, Serpa, had to go upstairs to get the money. The defendant told Serpa that he would retrieve the marijuana from the back of the vehicle.

Serpa backed away from the defendant's driver's side door toward the vehicle's bumper to allow the defendant access to the back seat area. The defendant reached into the rear of his vehicle behind the driver's seat with his back to Serpa, and when he emerged from the vehicle again, he swung his hand and hit Serpa on his left triceps with what felt to Serpa like a "punch." It was only after the second punch to Serpa's back that Serpa saw that the defendant was holding a knife. The defendant also stabbed Serpa on the front of his left thigh.

Serpa did not understand what was happening and asked the defendant, "[W]hat the fuck are you doing?" The defendant responded, "Where's the fucking money?" Serpa retreated down the street, and the defendant got into his vehicle and fled. Serpa then went to Diceglie's apartment building and Diceglie drove him to the hospital. The entire interaction between Serpa and the defendant on Myrtle Street lasted approximately two minutes and the attack was over in five to ten seconds.

Discussion. The defendant raises two challenges to his ABDW-SBI conviction: (1) that the judge abused her discretion in admitting in evidence over the defendant's objection a PowerPoint presentation, denominated Exhibit 42 at trial, prepared by the Commonwealth that combined portions of various previously-admitted exhibits, some of which were modified with highlighting; and (2) that the judge's instruction on lack of

right or excuse in the final jury charge essentially directed a verdict against the defendant on this charge, especially in combination with comments made by the prosecutor in his closing argument.

Although Exhibit 42 should not have been admitted as substantive evidence, for the reasons discussed below we conclude that the defendant was not prejudiced by its admission. We discern no error in the jury instruction and thus the Commonwealth's reference to the instruction in its closing did not result in a substantial risk of a miscarriage of justice.

1. Exhibit 42. a. Standard of review. Because the defendant objected to the admission of Exhibit 42, we review first to determine whether the trial judge abused her discretion in admitting the exhibit and, if so, whether the defendant was prejudiced thereby. See Commonwealth v. Rosario, 460 Mass. 181, 193 (2011). We grant "great deference to the judge's exercise of discretion" and determine whether the judge made a "clear error of judgment . . . such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (quotation omitted).

b. Admissibility. Exhibit 42 was based on a "PowerPoint" presentation that the Commonwealth used as a demonstrative to assist the jury in following some of the testimony of Detective Goulding, the lead investigator of the stabbing. The PowerPoint

presentation was projected on a screen in the court room, but jurors were also each given an individual printout of at least some of the PowerPoint slides showing Serpa's text messages. These printouts were collected from the jury at the conclusion of the relevant portion of Goulding's testimony. Defense counsel also requested that jurors have at least some portions of the text messages for her cross-examination of Goulding. When defense counsel finished with the portion of the PowerPoint presentation containing the text messages, the judge again had the jury return the printouts returned to the court officer.

As ultimately admitted in evidence, Exhibit 42 is a compilation of various pages chosen from previously-admitted exhibits. Specifically, Exhibit 42 incorporates subscriber information identifying the registered owners of various cell phone numbers believed to have been used by the defendant, Serpa, Diceglie, and friends and associates of the defendant; a condensed version of the content of Serpa's text messages on May 16, 2010, showing exchanges between the defendant's cell phone and Serpa and between Serpa and Diceglie; call logs from the cell phone registered to the defendant for a period of time beginning one week before the stabbing and continuing through the two days following the stabbing;[4] and maps depicting Serpa's

---

[4] Some of the pages from the defendant's cell phone call log are repeated multiple times in Exhibit 42, ostensibly to

movements on the evening of May 16, 2010, based on the tracking data from his GPS ankle bracelet.

Exhibit 42 was thus a hybrid document, combining aspects of summary compilation and attorney argument. Some of the combinations in the exhibit are not, on their own, clearly intended to reinforce the Commonwealth's arguments. For example, although the jurors could have cross-referenced cell phone numbers from the text messages and call logs with separately admitted subscriber information, it was arguably more convenient to have all of that information in one place. See Dyecraftsmen, Inc. v. Feinberg, 359 Mass. 485, 487 (1971) ("[T]ranscription of records present in the court room . . . was admissible, in the discretion of the judge, as a matter of convenience").

On the other hand, an examination of the content of Exhibit 42 in the context of the trial reveals its strategic purpose in the Commonwealth's case against the defendant. The text messages in Exhibit 42 formed the basis of the narcotics conspiracy that, in addition to being a separately charged offense, brought the defendant and Serpa together on Myrtle Street where the stabbing occurred. The inclusion of Serpa's GPS ankle bracelet records was an attempt to bolster Serpa's

demonstrate differences in calling patterns before and after the incident.

testimony by confirming movement consistent with his text messages and his trial testimony.  Exhibit 42 also appears intended to prove that the cell phone number registered to the defendant was in fact used by the defendant, countering an argument that the defendant raised at trial.  Most importantly, the sequencing and highlighting of the defendant's cell phone records demonstrated the abrupt cessation of contact between the defendant and Serpa after Serpa was stabbed, in contrast to the continuing communications between the defendant and his other key contacts, which continued after the stabbing.  The Commonwealth argued that this last point was particularly probative of the defendant's guilt.  We are therefore persuaded that Exhibit 42, as a whole, was not merely a neutral summary. It was "more akin to argument than evidence since [it] organizes the jury's examination of testimony and documents already admitted in evidence."  United States v. Bray, 139 F.3d 1104, 1111 (6th Cir. 1998) (quotation omitted).[5]

In admitting Exhibit 42 over the defendant's objection, the trial judge stated:  "Well, I've looked at the exhibits that it reflects, and I think that it would [be] unfair to ask the jury

---

[5] Although denominated as Exhibit 42, the judge's statement that she was "going to allow this to be marked as an aid to the jury" is more consistent with language allowing it to be used as a chalk or other demonstrative aid which is marked for identification but not introduced into evidence as an exhibit. See note 9, infra.

to go through each page of those exhibits. So I'm going to allow this to be marked as an aid to the jury, and there's no indication that it doesn't accurately reflect what the evidence is." As he did at trial, the defendant raises numerous challenges to the admissibility of Exhibit 42 on appeal. He maintains that Exhibit 42 was not properly admitted because it represents more of an argumentative device than a summary. He also contends that it was not helpful to the jury to have a collection of portions of exhibits that had already been introduced, that such a collection was a needless presentation of cumulative evidence, and that the exhibit's probative value was substantially outweighed by the danger of unfair prejudice. Specifically, the defendant contends that Exhibit 42 improperly emphasized only a portion of the Commonwealth's case and distracted the jury from weaknesses in the case because the jury could have mistakenly believed that Exhibit 42 was additional evidence, rather than a compilation of previously admitted evidence.

In determining whether Exhibit 42 was properly admitted, we look to the case law and the Massachusetts Guide to Evidence (2016). Because the Federal rules at play in Federal decisions "clarify[ing] the landscape," United States v. Milkiewicz, 470 F.3d 390, 395 (1st Cir. 2006), are analogous to guidelines at issue here in the Massachusetts Guide to Evidence, we also find

the Federal precedent a useful touchstone.[6]  See N.E. Physical

Therapy Plus, Inc. v. Liberty Mut. Ins. Co., 466 Mass. 358, 365-

366 (2013).  Cf. Shuman v. The Stanley Works, 30 Mass. App. Ct.

951, 952-953 (1991) ("We are . . . guided by judicial

interpretation of the parallel Federal rule [of procedure],

absent compelling reasons to the contrary or significant

differences in content").

Section 1006 of the Massachusetts Guide to Evidence

provides:

> "Summaries to Prove Content[.]  The proponent may use
> a summary, chart, or the like to prove the content of
> voluminous writings or records that cannot be
> conveniently examined in court.  The proponent may
> make the originals or duplicates available for
> examination or copying, or both, by other parties at a
> reasonable time and place.  And the court may order
> the proponent to produce them in court."

Rule 1006 of the Federal Rules of Evidence "creates an exception

to Rule 1002, which requires that originals be used to prove the

content of writings, recordings and photographs.  Evidence

admitted under Rule 1006 must be otherwise admissible and

remains subject to the usual objections under the rules of

---

[6] We note that while the Federal Rules of Evidence and the
Massachusetts Guide to Evidence maintain the same numeration,
the Federal Rules of Evidence refer to "Rules" while the
Massachusetts Guide to Evidence refers to "Sections."  In
contrast to the Federal Rules of Evidence, however, Mass. G.
Evid. § 102 states:  "The provisions contained in this Guide may
be cited by lawyers, parties, and judges, but are not to be
construed as adopted rules of evidence or as changing the
existing law of evidence."

evidence and the Constitution." United States v. Milkiewicz, 470 F.3d at 396. "[W]hile in most cases a Rule 1006 chart will be the only evidence the fact finder will examine concerning a voluminous set of documents, in other instances the summary may be admitted in addition to the underlying documents to provide the jury with easier access to the relevant information." Id. at 396-397 (citations omitted). Cf. Commonwealth v. Carnes, 457 Mass. 812, 825 (2010) ("Summaries of testimony are admissible, provided that the underlying records have been admitted in evidence and that the summaries accurately reflect the records"). With respect to summaries admitted in evidence, "care must be taken be taken to insure that [the] summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof." Welch v. Keene Corp., 31 Mass. App. Ct. 157, 165-166 (1991), quoting from United States v. Drougas, 748 F.2d 8, 25 (1st Cir. 1984).[7]

---

[7] As discussed in the cases, "pedagogical devices" subsumes argumentative aids. The Sixth Circuit provides a useful definition of the term "pedagogical device," explaining: "We understand the term 'pedagogical device' to mean an illustrative aid such as information presented on a chalkboard, flip chart, or drawing, and the like, that (1) is used to summarize or illustrate evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is itself not admitted into evidence; and (3) may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent. This type of

We agree with the defendant that Exhibit 42 is not a "summary, chart, or the like" used "to prove the content of voluminous writings or records that cannot be conveniently examined in court" as described in Mass. G. Evid. § 1006.  See Commonwealth v. Guy, 454 Mass. 440, 446 & n.5 (2009) ("notebooks" mirroring and visually summarizing lengthy and complex DNA testimony could have been admitted within the judge's discretion); Commonwealth v. Carnes, 457 Mass. at 825-826.  The case before us is not one where the proponent prepared a freestanding chart to tally the dates, times, and number of cell phone calls between various parties in order to summarize extensive, separate underlying business records.  Compare ibid.; United States v. Drougas, 748 F.2d at 26 ("We find that the charts . . . pictorially summarized over one hundred calls placed during the period of the conspiracy and were properly received under Rule 1006").  In Carnes and Drougas, the exhibits in question were independent creations derived from the "raw data," Commonwealth v. Carnes, supra at 826, of the previously admitted records and testimony.  Exhibit 42, on the other hand, combined portions of multiple exhibits and superimposed the Commonwealth's gloss on some of the previously admitted records

exhibit is more akin to argument than evidence since [it] organizes the jury's examination of testimony and documents already admitted in evidence."  United States v. Bray, 139 F.3d at 1111 (quotation omitted).

themselves.  As we have noted, rather than summarize the underlying records, the Commonwealth placed certain pages from individual exhibits alongside pages from other exhibits, and then altered some of those pages to highlight the portions of the raw data evidence relevant to the Commonwealth's theory of the case.  The exhibit thus falls outside the scope of admissible evidence.  See Commonwealth v. Welch, 31 Mass. App. Ct. at 165-166; Mass. G. Evid. § 1006.  It was error for the judge to admit the exhibit.

Finally, we note that we have found instructive the tripartite taxonomy of summary evidence that has been articulated by Federal courts, see, e.g. United States v. Bray, 139 F.3d at 1112, and recognized by the United States Court of Appeals for the First Circuit in United States v. Milkiewicz, 470 F.3d at 396-398.[8]  In addition to the (1) primary evidence summaries which we have already discussed, the taxonomy includes two types of summary evidence not considered here by the parties or by the court:  (2) pedagogical device summaries or illustrations (such as chalkboard drawings, graphs,

---

[8] The First Circuit has noted that "[t]he Federal Rules of Evidence offer multiple options for an attorney who wishes to summarize complex evidence and bring it to the jury's attention in the form of a chart.  The various rules are not always mutually exclusive, and so it is unsurprising that confusion sometimes arises . . . over the appropriate basis for admitting a particular summary."  United States v. Milkiewicz, 470 F.3d at 395.

calculations, or listings of data taken from the testimony of witnesses or documents in evidence) that are intended to summarize, clarify, or simplify testimonial or other evidence that has been admitted, but which are not themselves admitted in evidence as they are used only to aid the presentation and understanding of the evidence, see Mass. G. Evid. § 611(a)(1);[9,10]

---

[9] Massachusetts Guide to Evidence § 611(a) recognizes the trial court's common-law authority to "control" the "mode" of "presenting evidence." Trial judges have broad discretion to control the mode and order in which evidence is presented subject to proper balancing for risk of needless presentation of cumulative evidence and risk of unfair prejudice. See Mass. G. Evid. §§ 403, 611(a). Although the Massachusetts Guide to Evidence does not address the admissibility of "chalks," it is plain that "[a] judge . . . has considerable, but not unrestrained, discretion as to the degree to which chalks can be used." Commonwealth v. Mimless, 53 Mass. App. Ct. 534, 539 (2002), quoting from Commonwealth v. DiFonzo, 31 Mass. App. Ct. 921, 923 (1991). Chalks are not exhibits in evidence. See Aselbekian v. Massachusetts Turnpike Authy., 341 Mass. 398, 402 (1960) ("The judge, in his discretion, could reasonably have refused to admit the plan as an exhibit, while permitting it to be used as a chalk"). A judge's assessment whether a documents qualifies as a chalk or as an exhibit can change during the course of a trial. See, e.g., Commonwealth v. Shagoury, 6 Mass. App. Ct. 584, 593 (1978) (judge did not abuse his discretion in reducing a sketch first entered as an exhibit to "the status of a chalk").

[10] The First Circuit has observed that while "[t]he lines between [Fed.R.Evid. 1006 and 611(a)] summary documents are easily blurred," the latter are more akin to argument in that they "may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent." United States v. Milkiewicz, 470 F.3d at 397-398 (citation omitted). "A summary that is admissible under Rule 1006 -- and is thus most appropriately introduced under that rule -- could properly be offered under Rule 611(a) if the supporting material has been admitted into evidence. Likewise,

and (3) secondary evidence or hybrid summaries that are a combination of the first two types of summaries "in that they are not prepared entirely in compliance with Rule 1006 and yet are more than mere pedagogical devices designed to simplify and clarify other evidence in the case.  These secondary-evidence summaries are admitted in evidence not in lieu of the evidence they summarize but in addition thereto, because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence.  In the unusual instance in which this . . . form of secondary evidence summary is admitted, the jury should be instructed that the summary is not independent evidence of its subject matter, and is only as valid and reliable as the underlying evidence it summarizes."  United States v. Bray, 139 F.3d at 1112.[11]

---

a chart that originally was offered as a jury aid to assist with review of voluminous underlying documents already in evidence -- and which accurately summarizes those documents -- alternatively could be admitted under Rule 1006 if the court concluded that the supporting documents could not be examined conveniently in court.  To complicate matters, a court also has discretion under Rule 703 to provide the jury in some circumstances with the 'facts or data' underlying an expert's opinion, and such material may be presented in the form of a summary chart." Ibid.

[11] The Sixth Circuit has warned that "a summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every

It does not appear that either of the latter two kinds of summary evidence could be the basis for admission of Exhibit 42. While pursuant to the pedagogical device summary or illustrations category Exhibit 42 could have been marked for identification and shown to the jury as a chalk or demonstrative aid, as such it did not qualify as evidence. See note 9, supra; Vedensky v. Vedensky, 86 Mass. App. Ct. 768, 776 n.10 (2014) (chalk is not evidence). Nor does it appear that Exhibit 42 would have properly been admitted in evidence under the third category of admissible secondary evidence or hybrid summaries, where the evidence was not particularly complex or voluminous.

c. Prejudice. Having concluded that the admission of Exhibit 42 was error, we now consider whether the defendant was prejudiced by its admission. An error preserved by objection is nonprejudicial "if we are sure that the error did not influence the jury, or had but very slight effect." Commonwealth v. Graham, 431 Mass. 282, 288 (2000), quoting from Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). Where all of the material in Exhibit 42 was previously admitted in evidence and the limited duplication, sequencing, and highlighting of the exhibits by the Commonwealth added little to the Commonwealth's case and detracted little from the defendant's theory at trial,

time the jurors look at it during their deliberations." United States v. Bray, 139 F.3d at 1110.

we conclude that, even without a limiting instruction, Exhibit 42 exerted little or no effect on the outcome.

Although we are concerned about the risks of "mini-summation," see United States v. Bray, 139 F.3d at 1110, posed by hybrid exhibits that duplicate, resequence, and annotate previously admitted exhibits, the risks posed by Exhibit 42 were minimal. That is, to the extent the compilation and highlighting of exhibits was argument, it was not particularly powerful. Moreover, it was not damaging to the defendant.

At trial, the defendant himself pointed to Serpa's text messages because the story told therein of the defendant trying to help Serpa by extending him drugs on credit with no expectation of immediate payment that evening was inconsistent with the defendant demanding money and then stabbing Serpa. Thus, corroboration of Serpa's movements consistent with the text messages and cell phone calls arranging the "meeting" was hardly prejudicial.

If the repetition and sequencing of Serpa's GPS ankle bracelet records were intended to bolster Serpa's credibility to confirm that he was where he said he was on the day he was stabbed, they were hardly damaging to the defendant's case, given that the defendant had no reason to dispute Serpa's veracity in this regard and those records did nothing additional to substantiate Serpa's belated identification of the defendant

as his attacker.[12]  Nor is it likely that anything in Exhibit 42 distracted the jury from the multiplicity of reasons they had been given to discredit Serpa, including, inter alia, his inconsistent accounts of the stabbing, his prior convictions, the shorter sentence he received in exchange for his cooperation, and the conflict between his trial testimony and the blood pattern that detectives discovered on Myrtle Street.[13]

To the extent that Exhibit 42 emphasized the evidence showing that the defendant himself used the cell phone registered in his name on the day in question, it was tantamount to repetition of an open secret that the defendant emphasized throughout his closing argument.  Although the defendant was ostensibly reluctant at trial to explicitly admit that he was responsible for the texts messages and cell phone calls attributed to him for purposes of the narcotics charge, he was willing for the jury to accept that he was going to meet Serpa to conclude a drug transaction for purposes of the ABDW-SBI

---

[12] Moreover, duplication of Serpa's GPS ankle bracelet may have helped the defendant by reminding the jury of Serpa's probation status and, hence, his criminal past.

[13] The defendant contends that admission of Exhibit 42 was prejudicial because the duplication of evidence regarding the intended drug deal obscured the weakness in the Commonwealth's case, which was based on Serpa's implausible account of an unprovoked attack that was inconsistent with a drug transaction on credit and with Serpa's initial statements to the police.

charge.[14]  Thus, the defendant was not prejudiced by anything in

Exhibit 42 that simply reinforced a point on which he was

relying as well.

The demonstration that contact between Serpa and the

defendant stopped after May 16, 2010, is the only fact

reinforced by Exhibit 42 that the defendant was not himself

prepared to concede.  But the inference itself was fair game

from the underlying evidence and had already been suggested,

without objection, during Detective Goulding's testimony.  This

was so subtle a point that the jurors might have misperceived

its significance if not for the reinforcement in Exhibit 42.  It

is doubtful that any additional emphasis on that point in

Exhibit 42 had any impact on the verdict.

In addition to focusing on what the Commonwealth might have

hoped Exhibit 42 would accomplish, to assess its impact on the

verdict we also point out what Exhibit 42 could not do.  Putting

aside the defendant's arguments on the use of his cell phone,

---

[14] Consider the following statements in the defendant's
closing argument:  "If you believe that that was James Wood on
the phone, James Wood is trying to help out Carlos Serpa, giving
him a half a pound of marijuana, not asking for any money up
front. . . .  And they make arrangements to meet, he and
whoever's on the Wood phone.  And if you want to believe that
story that it was James Wood, they meet . . . ."  "If you are to
believe Carlos Serpa's story on December 9th, why -- why would
James Wood stab him?  He's meeting him to help him.  He's
meeting him to give him drugs, without asking for any money."
"But I suggest that even if you say, okay, it had to be James
Wood on the phone that night, it still makes no sense."

the defense at trial was essentially that the defendant had no motive to attack Serpa and that Serpa's account of the attack could not be trusted. Exhibit 42 did no more to address those holes in the Commonwealth's case than the individual underlying exhibits and testimony that the jury heard when they had copies of some of the PowerPoint slides during Goulding's testimony. Thus, if Exhibit 42 was intended as a "roadmap[] to conviction" to the ABDW-SBI charge, United States v. Best, 939 F.2d 425, 428 (7th Cir. 1991), it was not sufficient to get the jurors materially closer to that destination than (i) the implicit concessions made by the defendant that essentially acknowledge the planned drug transaction and (ii) the clear import of the underlying exhibits and testimony on their own.

For all of the foregoing reasons, after "review of the entire trial," Commonwealth v. Barbosa, 463 Mass. 116, 124 (2012), we conclude that the defendant was not prejudiced by the admission of Exhibit 42.

2. Absence of right or excuse. The defendant also challenges the judge's jury charge on the ABDW-SBI offense in which the judge instructed the jury as a matter of law that there was no right or excuse for the defendant to have touched Serpa. Specifically, he contends that comments by the prosecutor in closing argument anticipating the instruction combined with the instruction itself to direct a verdict against

him.  The relevant portions of the Commonwealth's closing and the judge's instructions and are set out in the margin.[15]

a.  Standard of review.  The defendant did not object to the instruction on right or excuse at the charge conference or after the jury were charged.  The defendant also failed to raise any objection to the Commonwealth's closing argument.  Accordingly, the defendant has failed to preserve his claim of error, and our review is limited to the substantial risk of a miscarriage of justice standard.  See Commonwealth v. Randolph, 438 Mass. 290, 294-295 (2002).

b.  Jury instruction.  The defendant contends that the judge's instruction on lack of right or excuse was erroneous.

---

[15] In his closing argument, the prosecutor stated:

"When [the defendant] gets out of the car and goes into the back seat, he's decided I'm getting my money, I'm not giving him anything, and I'm going to kill him.  And your evidence of it is Carlos Serpa is unarmed.  And the judge is actually going to instruct you on that.  In this case, you will be instructed that there is no evidence of excuse or justification for this assault, none.  You don't have to speculate why, in terms of whether there's an excuse or justification, because you're being told there isn't one. He just stabbed him.  And how many times do you need to stab an unarmed man to get your point across, if your intent isn't to kill him?"

In her instructions, the judge stated:

"Now, the first element, that the defendant touched the person of Carlos Serpa, however slightly, without having any right or excuse for doing so, I instruct to a matter of law that in this case there is no right or excuse for doing so, and so you're not to consider that in any way."

We disagree. The essence of the defendant's trial strategy was to deny that he was Serpa's attacker and to sow reasonable doubt by exploiting Serpa's credibility problems and the inconsistencies between and within Serpa's varying accounts of the attack. The defendant understandably did not attempt to elicit any evidence of self-defense or of a right or excuse for the alleged battery. Consistent with this approach, the defendant's trial counsel informed the judge that she did not intend to argue self-defense in closing and therefore had no objection to the Commonwealth's motion to preclude such argument and to instruct the jury on the lack of right or excuse with respect to the ABDW-SBI indictment. See Commonwealth v. Conley, 34 Mass. App. Ct. 50, 58 (1993) (noting that where the defendant claimed that an attack never happened, "[a] self-defense instruction would be contrary to his defense"). In these circumstances, we have held that "it was proper for the judge . . . to give the instruction concerning the lack of evidence as to right and excuse." Ibid.

The defendant suggests that an instruction stating that there was no evidence of right or excuse in this case might have been acceptable but that in instructing the jury that, as a matter of law, the defendant had no right or excuse for touching Serpa and that the jury were not to consider that in any way, the judge went too far. We do not see a meaningful difference

in the distinction the defendant seeks to tease from the trial judge's wording. "The method and extent of a jury charge is within the discretion of the trial judge." Commonwealth v. Carrion, 407 Mass. 263, 269 (1990). "We do not require that judges use particular words, but only that they convey the relevant legal concepts properly." Commonwealth v. Kelly, 470 Mass. 682, 697 (2015). The judge's instruction here properly conveyed the applicable legal concept that, consistent with the defendant's theory at trial, this was not a case where there was any evidence that the defendant had an excuse to touch Serpa. See Commonwealth v. Reed, 427 Mass. 100, 103 (1998).

The defendant raises numerous additional challenges to the instruction, all of which lack merit. He contends that the instruction deprived him of defenses based on a reasonable fear for his safety. Again, such a defense would have been completely inconsistent with the defendant's theory of the case. See Commonwealth v. Tevlin, 433 Mass. 305, 318 (2001) ("The theory on which a case is tried will not be ignored on appeal"). The defendant also suggests that the instruction undermined his argument that an unidentified third party was responsible for the attack by suggesting to the jury that no one had a right or excuse to attack Serpa. By its terms, however, the instruction only applied to the question of the defendant's right or excuse to touch Serpa. The instruction was silent on the question

whether anyone else might have had a right or excuse to touch Serpa and, crucially, left to the jury the question whether the Commonwealth has proved beyond a reasonable doubt that it was the defendant who committed the battery. The instructions as a whole made it clear that the defendant was presumed innocent until and unless the jury unanimously decided that the Commonwealth had proved that the defendant was guilty of each and every element of a particular charge beyond a reasonable doubt. "The legal adequacy of a particular instruction to the jury can only be judged in the context of the whole charge, and not on the basis of limited or isolated portions of it. This is because it is impossible to gauge the over-all impact on a reasonable juror of any one piece parsed out of an instruction without examining the entire charge in which it was delivered." Commonwealth v. Carrion, 407 Mass. at 270 (citations omitted).

For the same reasons, the instruction did not remove the question of Serpa's credibility from the jury. Nor did the instruction somehow bolster Serpa's credibility. The jury were instructed that they were the sole and exclusive judges of the facts, that they alone were to determine the weight, effect, and value of the evidence as well as the credibility and believability of each and every witness, that they must consider, measure, evaluate, and carefully weigh all of the testimony of all witnesses, and that they could believe all of

what a witness said, some of what a witness said, or none of what a witness said. The instructions specifically invited jurors to consider a witness's motive for testifying, how probable or improbable the testimony was, and the effect of prior inconsistent statements on credibility. The judge also explicitly instructed the jurors that they could consider evidence of Serpa's prior convictions and his probation status for purposes of deciding whether to believe his testimony and how much weight to give it. Where Serpa's credibility was a live issue, there is no basis to believe that jurors misconstrued the judge's proper instruction on absence of right or excuse as an endorsement of Serpa. Moreover, the judge also told the jurors that none of what she told them about the law was to be taken as any indication of how they should determine the issues of fact in the case, adding: "If you believe the Court has expressed or, in any way, indicated an opinion about the facts, you should disregard it." See Commonwealth v. Kelly, 470 Mass. at 697 ("We evaluate jury instructions as a whole and interpret them as would a reasonable juror"). There was no error and thus no substantial risk of a miscarriage of justice. See Commonwealth v. Randolph, 438 Mass. at 298; Commonwealth v. Kelly, supra at 698.

c. Closing argument. We agree that the prosecutor's incorporation of the anticipated jury instruction in his closing

argument was inartful, note 15, supra, and that insofar as his argument could be construed as stating that the jury would be instructed that the defendant had assaulted Serpa, this was impermissible.  However, we conclude that any error did not give rise to a substantial risk of a miscarriage of justice.

As discussed above, the judge's actual instruction on absence of right or excuse that followed closing arguments was proper.  Moreover, the judge instructed the jury that they had to find each element beyond a reasonable doubt.  See Commonwealth v. Dagley, 442 Mass. 713, 725 (2004) ("That the judge's final instruction did not include any express correction of the prosecutor's mischaracterization does not mean that the instruction was inadequate to cure any confusion caused by that mischaracterization").  Cf. Commonwealth v. Montez, 450 Mass. 736, 748 (2008) ("Although not dispositive of the issue, the absence of [an objection on this precise point and the absence of a request for a curative instruction] from experienced counsel is some indication that the . . . substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial" [citation omitted]).[16]

---

[16] The defendant's failure to object is particularly problematic where the challenged comments in the prosecutor's closing argument related to an anticipated jury instruction and so would have been susceptible to a curative instruction from the judge during the final charge if she deemed it necessary.

In general, the Commonwealth's closing argument was dedicated to reviewing the evidence of the cell phone call logs, the GPS ankle bracelet records, and the defendant's cell phone tower data, and to showing the jury how that evidence supported Serpa's trial testimony.  The prosecutor made a particular point of trying to show that Serpa could not have concocted the story to conform to the evidence and to explain the apparent inconsistencies between the blood trail and Serpa's trial testimony.  In addition, the prosecutor tried to explain to the jury why the defendant might have attacked Serpa, explaining that because of the defendant's unfamiliarity with street-level narcotics transactions, he found himself in the unenviable position of meeting Serpa, a convicted armed robber, after dark in unfamiliar territory.  The prosecutor characterized the stabbing as the defendant's foolish reaction to finding himself in this predicament.  All of this argument was designed to persuade the jury that the defendant committed the attack and would have been unnecessary had the jury been instructed as a matter of law that the defendant had stabbed Serpa.

Thus, "in the context of the entire closing, and the manner in which the case was prosecuted," Commonwealth v. Gray, 465 Mass. 330, 341 (2012), the prosecutor's incorporation of the anticipated instruction on absence of right or excuse would not have confused the jury about the fundamental question before

them, which was whether the defendant was in fact the assailant who stabbed Serpa.  See Commonwealth v. Cass, 12 Mass. App. Ct. 928, 929-930 (1981).  We are therefore satisfied that any error did not "materially influence[]" the verdict and that the defendant was not prejudiced.  Commonwealth v. Randolph, 438 Mass. at 298.

Judgments affirmed.