SACKS, J.
*563 The defendant appeals from his convictions, after a jury trial, of assault with intent to rape, kidnapping, indecent assault and battery on a person fourteen years of age or older, and assault and battery. On appeal, he asserts that errors in the admission of evidence that he was the attacker, *302 and in the jury instructions on eyewitness identification, created a substantial risk of a miscarriage of justice. We conclude, in light of the overwhelming evidence from video recordings of the attack and from the testimony of the victim and other witnesses, that there is no reason to disturb the jury verdicts. The defendant also asserts that the judge relied on improper factors in imposing a sentence of from twelve to eighteen years in State prison on the assault with intent to rape charge. We agree that the judge's comments at sentencing risked creating at least the appearance that she sentenced him for having committed either rape (a crime of which he was not convicted) or assault with intent to commit aggravated rape (conduct not recognized as a crime under the laws of the Commonwealth). We therefore find it necessary to vacate the sentences and remand for resentencing before a different judge.
Background. 1. The attack. The jury could have found the following facts. The attack occurred in the early morning hours of August 23, 2015, in the city of Lowell. The victim left a friend's house to walk home at about 3:25 A.M. As she approached an overpass,[1] a man made several remarks to her, but she ignored him and kept walking. She saw a fire truck drive by. She walked off the overpass and up Middlesex Street. Just as she reached a store known as Pailin City, where Branch Street forks off from Middlesex Street, she "felt like someone was coming up behind"
*564 her. She started to turn around, but a man was already grabbing her hair with one hand and covering her mouth with the other. She struggled to escape, but he pulled her closer and told her to "shut up." As they continued to struggle and she screamed for help, he said, "I'm not going to kill you. I just want to have sex with you."
She began trying to look at her attacker, so that "if [she] survived this, [she] could at least identify this person." He was a stranger, and she could not tell if he was the man from the overpass. But now they were under a "big street light" and she could see him "[e]nough so ... [she] could remember what the man looked like." He was "[a] lot larger" than the victim, who was five feet, two inches tall and weighed 124 pounds. He was white, with short hair, and wore a red shirt and black shorts. He wore black and gray socks, but no shoes, which struck the victim as odd; it was raining that night.
He hit her and dragged her toward an alley that ran from Branch Street, alongside Pailin City, to an area containing parking spaces and some dumpsters, bordered by another street. He dragged her through the alley and behind the dumpsters; as she screamed for help, he tore off her clothes. As she was on the ground, with her "knees and [her] face ... in the dirt," he was behind her and she could feel his penis touching her "butt" and her vaginal area.
At that moment, "[r]ight before it actually went to go penetrate [her], someone came around the corner." It was an Asian man; he came closer and drew the attacker's attention, allowing the victim to escape, gather some of her clothes, and run back up the alley onto Branch Street.[2] She ran over to a nearby fire station, where a firefighter brought her inside and called police and an ambulance. While she was talking to ambulance personnel, the Asian man arrived. Other than him and her attacker, *303 she had not seen anyone else walking on the street that night.
Coincidentally, the firefighter, Captain Robert Beane, had been in the fire truck that had driven near the overpass earlier. He had seen a man, about five feet, ten inches tall, with "[l]ighter skin, short hair, ... [and] a red shirt on." A short distance away, he had seen a woman walking on the sidewalk. When the victim later came to the fire station, he recognized her as the same woman.
The Asian man, Richard Chea, had been at a friend's house near the parking area behind Pailin City when he heard a woman *565 screaming for help. He followed the sound over to an area behind the dumpsters, where he saw the victim and a man "taking advantage of her." The attacker wore a red T-shirt and black shorts. He told the attacker to stop and suggested that the victim go to the fire station. As she did so, the attacker ran off in the opposite direction.
2. The investigation. That same day, Lowell Police Detective Todd Fenlon canvassed the area and learned of numerous surveillance cameras on buildings along Middlesex Street where the victim had walked, from Crowe and Sons Electrical Corp. (Crowe Electrical) near the overpass, past the Boys and Girls Club, to Pailin City. He obtained copies of video recordings made by those cameras during the relevant time period.
At about 6 A.M. on the following day (August 24), the defendant appeared at the Lowell Police Station and told Detective Fenlon and another detective that he had information about a sexual assault that had been reported in the newspaper. The newspaper article concerned the assault on the victim; the defendant stated that he believed he had seen a woman connected with the incident. He said that at about 3 A.M. , while outside a 7-Eleven store near the overpass, he had seen a small young woman. He had made several remarks to her (the content of which matched the victim's account), but she had "ignored him." The defendant asserted that he had walked off of the overpass onto Middlesex Street[3] and did not know what had happened to the woman after that.
The defendant also told the detectives that his feet had been hurting that night and that, because it was raining and his shoes and feet were wet, he had taken off his shoes near the overpass and was walking in his socks. The defendant showed the detectives his feet, which appeared swollen. He explained in detail what he had been doing before 3 A.M. and after 8 A.M. , but when asked what he had done between those two times, he said that he did not know, or he replied by repeating what he had done after 8 A.M.
The detectives showed the defendant a still photograph (photo), taken from the Boys and Girls Club video, that depicted a man on *566 Middlesex Street. The defendant said, "That's me."[4] He explained that the photo showed him placing a jacket on top of a dumpster.[5] The photo, in black and *304 white, showed the defendant with short hair, wearing a lighter-colored T-shirt and dark-colored shorts.
The defendant was then shown some of the actual Boys and Girls Club video, which depicted the man walking up Middlesex Street, from the direction of the overpass, past the dumpster, where he placed the jacket. The defendant again identified himself as the man shown. The defendant maintained, however, that he had not seen any woman in front of him. He was also shown video from Crowe Electrical that showed a man walking off of the overpass on Middlesex Street; the defendant identified the man as himself. After being shown a longer video clip that showed both the victim and the defendant walking behind her, the defendant again stated that he had not seen any woman walking in front of him.
3. Photographic arrays. Police showed the victim a photographic array (photo array), and she selected a photo that she recognized as the man in the red shirt. Asked if she was "sure," she said she was; asked how sure, she replied that on a scale of one to ten she would "give it an 8." At trial she testified that she did so "[b]ecause no one ever says 10 out of 10," but that that did not mean she was not "sure." Police also showed Captain Beane a photo array, and he recognized a photo as showing the man with the red shirt that he had seen from the fire truck. Chea was shown a photo array but was unable to recognize the attacker among the photos.
4. Video evidence at trial. At trial, copies of the videos were admitted in evidence, and parts of them were played for the jury. The Commonwealth also offered in evidence a one-page "[t]imeline" of the videos, listing and describing what it viewed as the relevant footage and where that footage could be found on the individual videos. The Commonwealth also created an approximately six-minute compilation video (compilation), which showed *567 clips from some of the individual videos listed on the timeline, arranged in chronological order. The compilation was admitted in evidence and played for the jury.
The compilation began with Crowe Electrical footage of the victim walking off the overpass on Middlesex Street, followed thirty-five seconds later by the man the defendant identified as himself, walking and occasionally trotting in a distinctive manner. Next came footage from the Boys and Girls Club (further up Middlesex Street) showing the victim and the defendant, now fifteen seconds behind her and still trotting intermittently. The compilation then showed Pailin City footage in which, just as the victim reached the front of Pailin City, a man caught up to her, grabbed her, struggled with her, and dragged her toward the alley entrance. The man appeared to be dressed identically to the defendant in the previous videos and was trotting in the same manner.
The compilation next showed footage from a camera on the rear of Pailin City: a man dragged a woman out of the rear of the alley and into the dumpster area, where they continued to struggle with each other for about two minutes. The footage was too dark to see the man's clothing. Then a third individual appeared, jogging toward the dumpsters; fifteen seconds after he arrived, the victim emerged and ran toward the alley entrance. After she entered the alley, a fourth individual appeared from the same direction as the third. Five seconds later, the compilation showed footage from another Pailin City camera depicting a man, dressed identically to the defendant, trotting and running away in another direction.
Discussion. 1. Claimed errors at trial. On appeal, the defendant argues that the photo array evidence should have been excluded *305 as irrelevant, that Detective Fenlon impermissibly gave lay opinion testimony about the videos, that the compilation and timeline were improperly admitted as summaries of the underlying videos, and that the judge improperly omitted certain language from the eyewitness identification jury instruction mandated by the Supreme Judicial Court. With one exception, all of these issues are unpreserved. Considering the issues seriatim, we agree that some errors occurred, but we nevertheless conclude, in light of the overwhelming evidence that the defendant was the attacker, that there is no reason to disturb the verdicts.
a. Photo arrays. Both the victim and Captain Beane testified to having chosen photos out of the arrays that they believed depicted *568 the man in the red shirt. The photo arrays themselves, with the victim's and Captain Beane's handwriting on the photos they had chosen, were admitted in evidence. But the Commonwealth offered no evidence that the chosen photos actually depicted the defendant or even that any photos of the defendant were included in the arrays.[6] The Commonwealth had informed the judge on the first day of trial that the detectives would testify that the defendant's photo was in the arrays, but no such testimony was ever elicited.[7]
The defendant argues that, without testimony that the chosen photos depicted him, the array evidence failed the basic test of relevance. See Mass. G. Evid. § 401 (2019) ("Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence and (b) the fact is of consequence in determining the action"). The defendant did not, however, preserve the argument, which would have required him to move to strike the photo array evidence once the Commonwealth failed to offer evidence that the chosen photos depicted him.[8]
Although the relevance question may not be as clear-cut as the defendant suggests, we need not decide it here.[9] The *306 issue is unpreserved, *569 and any error created no substantial risk of a miscarriage of justice.[10] That is, we do not have "a serious doubt whether the result of the trial might have been different had the [claimed] error not been made." Commonwealth v. LeFave, 430 Mass. 169, 174, 714 N.E.2d 805 (1999). Here, even absent the photo array evidence, the Commonwealth's case was overwhelming. The video evidence standing alone -- and even more so when coupled with the defendant's statements to the police and the essentially unchallenged testimony of the victim, Captain Beane, and Chea concerning the events of that evening -- pointed unequivocally to the conclusion that the defendant was the attacker. The defendant offers no plausible explanation of how the jury could have entertained any reasonable doubt about his guilt. We are confident that exclusion of the photo array evidence would have made no difference in the result of the trial.
b. Lay opinion testimony. As Detective Fenlon recounted for the jury how he had shown video clips to the defendant, and as the jury viewed one of those clips, the detective testified that a dumpster visible in the clip was "the same dumpster that [the defendant] identified himself as putting something on." Moments later, as the prosecutor prepared to play another clip, she asked the detective to explain what it would show, and he testified, "You're going to see the person who attacks [the victim] later place an item onto the dumpster right here" (emphasis added). The defendant's objection was overruled. The defendant now argues *570 that it was for the jury to decide whether the person seen placing an item on the dumpster -- concededly, the defendant -- was the same "person who attack[ed] [the victim] later" as shown in the Pailin City videos, and that Detective Fenlon's testimony to that effect was inadmissible lay opinion.[11] We agree.
"[T]he opinion of [the detective] that the defendant was the man in the videotape was inadmissible. The jury were capable of viewing the videotape and drawing their own conclusions regarding whether the man in the videotape was the defendant without the assistance of [the detective's] testimony." Commonwealth v. Austin, 421 Mass. 357, 366, 657 N.E.2d 458 (1995). No doubt there are circumstances in which a lay witness's testimony as to the identity *307 of a person shown in a photo or video is admissible, but none of them was present here. See, e.g., Commonwealth v. Connolly, 91 Mass. App. Ct. 580, 588-593, 78 N.E.3d 116 (2017) ; Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 323-329, 729 N.E.2d 642 (2000). See also Mass. G. Evid. § 701 note (2019).
Although admission of the detective's opinion was error, it was not prejudicial; we are "sure that the error did not influence the jury, or had but very slight effect" (quotation omitted). Commonwealth v. Flebotte, 417 Mass. 348, 353, 630 N.E.2d 265 (1994). The only contested issue at trial was whether the defendant was the attacker, and the videos themselves were the strongest (and virtually irrefutable) evidence on that issue. The jury viewed all of the relevant videos in the courtroom, and they asked for a method to view the compilation video again while deliberating. The jury were able to see for themselves that the attacker shown fleeing in the Pailin City footage was dressed in the same manner and moved with the same distinctive trotting gait as the man the defendant had identified as himself in other footage. We are confident that the detective's opinion that the two men were one and the same had little if any effect on the jury.
c. Compilation and timeline. The defendant next argues that the compilation and the timeline describing certain parts of the videos were inadmissible, both because no summaries of the underlying videos were warranted and because the compilation and the timeline unfairly emphasized evidence helpful to the Commonwealth's case. As the defendant did not object at trial, we examine *571 whether any abuse of discretion in admitting the exhibits created a substantial risk of a miscarriage of justice.
We first review certain governing principles. "The proponent may use a summary, chart, or the like to prove the content of voluminous writings or records that cannot be conveniently examined in court." Mass. G. Evid. § 1006 (2019).[12] "[T]he summary may be admitted in addition to the underlying documents to provide the jury with easier access to the relevant information." Commonwealth v. Wood, 90 Mass. App. Ct. 271, 278, 58 N.E.3d 1056 (2016), quoting United States v. Milkiewicz, 470 F.3d 390, 397 (1st Cir. 2006). But, "[w]ith respect to summaries admitted in evidence, 'care must be taken ... to insure that [the] summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof.' " Wood, supra at 278-279, 58 N.E.3d 1056, quoting Welch v. Keene Corp., 31 Mass. App. Ct. 157, 165-166, 575 N.E.2d 766 (1991). We review a decision to admit such a summary in evidence for abuse of discretion. Wood, supra at 275, 58 N.E.3d 1056.
Turning to the compilation, we see no abuse of discretion in the judge's implicit *308 determination that the individual underlying videos could not "be conveniently examined in court." Mass. G. Evid. § 1006. There were numerous individual video files, containing considerable footage that had no apparent relevance to any issue in the case, and existing in different electronic formats that required different computer programs to view. To be sure, the Commonwealth was able to play portions of those videos for the jury in the courtroom. But, contrary to the defendant's argument, the judge could have concluded that a deliberating jury would have found it difficult to master the technology necessary to find *572 and view the relevant parts of the videos in the jury room.[13] It might have been possible, but we cannot say it would have been "convenient[ ]." Id.
Nor has the defendant persuaded us that, by omitting certain footage, the compilation "unfairly emphasize[d] part of the [Commonwealth's] proof" (quotation omitted). Wood, 90 Mass. App. Ct. at 279, 58 N.E.3d 1056. The defendant argues that the omissions unfairly downplayed that "more was happening on the night in question in that area of Lowell than the Commonwealth suggested," and unfairly implied that the defendant "was the only other person out."[14] But beyond these vague arguments, the defendant has offered no plausible explanation of how the footage would have assisted his defense if included in the compilation. He does not suggest that the jury could have thought that either of the individuals seen in the omitted segments might have been the attacker. We have carefully considered these and the defendant's other claims[15] and conclude that no unfair editing occurred.
The defendant does, however, point to material inserted into the compilation that did not belong there: three still photos, taken from surveillance video of a 7-Eleven store recorded at about 8 A.M. on the morning of the attack, showing a man at the 7-Eleven store. Detective Fenlon testified that he showed one of the photos to the defendant at the police station and the defendant identified the man in the photo as himself. The three photos themselves were separately admitted in evidence. Because they could "be conveniently examined in court," there was no basis to include them in a "summary" (i.e., the compilation) admitted under Mass. G. Evid. § 1006. Moreover, the photos were not part of a fair summary of the video evidence from the time immediately surrounding *573 the attack. Rather, they were from a period of about four hours later and were apparently included for the purpose of emphasizing certain features of the defendant's clothing. In this single, quite limited respect,[16] the compilation was "more *309 akin to argument than evidence since [it] organize[d] the jury's examination of testimony and [materials] already admitted in evidence." Wood, 90 Mass. App. Ct. at 277, 58 N.E.3d 1056, quoting United States v. Bray, 139 F.3d 1104, 1111 (6th Cir. 1998).
As for the timeline, the defendant does not challenge the propriety of giving the jury a neutral chart listing the key parts of the videos, but identifies two ways in which the timeline here was not neutral. First, various entries used the same term, "suspect," to refer both to the person depicted in the Boys and Girls Club videos and the person depicted in the Pailin City videos, when it was for the jury to decide whether the person shown in the Boys and Girls Club videos (who the defendant had admitted was himself) was also the person shown in the Pailin City videos (the attacker). The over-use of the term "suspect" essentially embodied an opinion, much like that expressed by Detective Fenlon, that the person walking past the Boys and Girls Club was indeed the attacker.
Second, the timeline listed various video clips under the heading, "Only other person in area, other side of road, different clothing." This heading unnecessarily emphasized evidence suggesting that the man depicted was not the attacker, thereby bolstering the Commonwealth's theory that the attacker could only have been the defendant. Although there was nothing inaccurate in how the heading differentiated the man shown in the listed clips from the attacker shown in the Pailin City clips,[17] the purpose of the timeline was not to selectively summarize the *574 content of the clips; it was merely to inform the jury of where on the videos certain key events could be viewed. The timeline could and should have used a neutral heading.[18]
We are unpersuaded, however, that these limited errors in the compilation and timeline created a substantial risk of a miscarriage of justice. As suggested above, see note 16, supra, the inclusion of the 7-Eleven photos in the compilation, to the extent that they emphasized certain items of the defendant's clothing, had little impact on the case. The timeline's over-use of the word "suspect," like Detective Fenlon's opinion, created at most a negligible risk of influencing the jury. Their focus would have been on the videos themselves. And the timeline heading concerning the "[o]nly other person in area" likely had little if any impact; the defendant never argued, nor were the jury likely to have believed but for the heading, that that other person had any involvement in the attack.
*310 d. Instructions on eyewitness identification. The defendant argues that the judge's instructions omitted some applicable portions of the Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015) (model instructions).[19] The omitted language directs the jury to consider "for how long" the witness was able to look at the person identified, "[h]ow good were the lighting conditions," and whether "the witness [was] under a high level of stress."[20] Id. at 1054. But, just as we concluded above that the result of the trial would have been the same even if the photo *575 array evidence had been excluded, so do we conclude here that the result would have been the same even if the jury, properly instructed, had chosen to disregard that evidence. Considering that error and the cumulative effect of all of the errors we have identified, see Commonwealth v. Cancel, 394 Mass. 567, 576, 476 N.E.2d 610 (1985), and taking into account the preserved but nonprejudicial error in the admission of Detective Fenlon's opinion testimony, there was no substantial risk of a miscarriage of justice.
2. Sentencing. The defendant asserts that the judge's statements at sentencing[21] require resentencing before a different judge.[22] He argues that the sentence of from twelve to eighteen years in State prison for assault with intent to rape had at least the appearance of being based on consideration of criminal conduct for which the defendant had not been convicted. Although the sentence was lawful insofar as it was less than the statutory twenty-year maximum, see G. L. c. 265, § 24, and although "it is not within the power of [the appellate] court[s] to review an otherwise lawful sentence," we "may review the penalty imposed upon a defendant who has been sentenced for a crime other than that for which he stands convicted." Commonwealth v. Coleman, 390 Mass. 797, 804, 461 N.E.2d 157 (1984).[23]
*311 Here, in explaining her sentence, the judge came perilously close to stating that she sentenced the defendant for committing crimes of which he was not convicted. The judge began by explaining to the defendant her view that he should not benefit from *576 the fortuity that Chea's intervention stopped him from completing the rape:
"[T]he victim in this case got the benefit of a Good Samaritan who happened to hear her screaming and happened to be able to get to her before you were able to complete a rape.... But based on the facts as I have them and heard them, I don't think that you get the benefit of that Good Samaritan's act, because were it not for his presence, there is no[ ] doubt, based on the evidence that I heard and the evidence that I watched on video, there's no doubt that you would not have stopped where you did because of his intervention."
The judge then went on to state her view that the assault with intent to rape charge of which the defendant had been convicted did not sufficiently capture the severity of his conduct:
"I also am convinced, having looked at the [sentencing] guidelines, that they don't adequately address what happened here. And I say that they don't adequately address what happened here because I don't believe that assault with intent to commit rape is exactly what happened. That was the crime that the Commonwealth had to charge, but the evidence suggests something quite different. And the victim of the particular cruelty on a particularly vulnerable victim suggests that the guidelines simply do not adequately address that.
"I am going to impose a sentence on you that is a significant upward departure from those guidelines. I believe I have explained to you why I'm doing that."
The judge then came to the core of her rationale:
"I am going to sentence you in accordance with what the guideline would be had the rape been completed, which is a 12-to-18-year sentence. That is what I understand assault with intent to commit aggravated rape, if that statute existed, that is the crime that I believe has occurred here."
In short, the judge could be understood to have said that she sentenced the defendant for having committed rape (a crime of which he was not convicted) or for having committed assault with intent to commit aggravated rape (conduct that is not recognized *577 as a crime under the laws of the Commonwealth).[24]
No doubt, "the nature of the offense and the circumstances surrounding the commission of the crime" are legitimate and important sentencing considerations. Id. at 805, 461 N.E.2d 157. The judge here could properly have considered that the assault with intent to rape was made more serious by the circumstances that (1) the defendant came very close to completing the rape and (2) the offense was committed in conjunction with a kidnapping, a factor that aggravates the punishment for a completed rape. See G. L. c. 265, §§ 22(a ), 26. We do not question that the judge could properly have imposed a sentence of from twelve to eighteen years *312 in State prison based on consideration of those circumstances.
But a sentence must not only be lawful, it must also appear lawful. In cases where there is reason to think a sentencing judge may have considered uncharged conduct for an improper purpose, the courts have not hesitated to order resentencing. Thus, in Commonwealth v. Henriquez, 440 Mass. 1015, 796 N.E.2d 843 (2003), the court said that "no matter how carefully parsed, the judge's comments at sentencing are at best ambiguous as to whether the uncharged conduct was used for a proper as opposed to an improper purpose in sentencing," and the ambiguity "create[d] a sufficient concern about the appearance of justice that resentencing is required." Henriquez, supra at 1015-1016, 796 N.E.2d 843. Similarly, in Commonwealth v. White, 48 Mass. App. Ct. 658, 724 N.E.2d 726 (2000), it appeared that a sentencing judge had improperly considered perceived inadequacies in the defendant's prior sentences for other crimes; we concluded that " '[t]he appearance and interests of justice [would] be better served by resentencing' ... before a different judge." Id. at 664, 724 N.E.2d 726, quoting Commonwealth v. Lebron, 23 Mass. App. Ct. 970, 972, 503 N.E.2d 472 (1987). In Lebron, as here, although the sentencing proceedings were "otherwise very fair and deliberate," and although it was possible that the improper factors mentioned by the judge caused the defendant "no actual harm" in the sense of a heavier sentence, "[n]evertheless, the judge's remarks [were] subject to misunderstanding," and resentencing before a different judge was warranted. Lebron, supra. See Commonwealth v. Henriquez, 56 Mass. App. Ct. 775, 782 & n.6, 780 N.E.2d 118 (2002) (collecting cases), S.C., 440 Mass. 1015, 796 N.E.2d 843 (2003).
*578 Although the factors mentioned by the judge here were not improper in precisely the same way as in the cases just cited, we think that the larger principle of the appearance of fairness in sentencing still applies. A defendant leaving a courtroom to begin serving a lengthy prison term should not be left with the impression that he was sentenced for a crime of which he was not convicted or for a "crime" that is not actually a crime under our laws.[25]
Conclusion. The verdicts are affirmed. The sentences are vacated, and the case is remanded for resentencing before a different judge.
So ordered.

The victim and another witness sometimes referred to the area, the Lord Overpass, as a rotary. For consistency, we use the term "overpass" throughout.

While in the alley, she heard gunshots behind her. She did not know who fired them; she had not seen her attacker with a gun.

The police witnesses used the name Branch Street to refer to a section of roadway that was referred to as Middlesex Street by the victim, numerous other witnesses, and several maps admitted in evidence. For clarity, we use the term Middlesex Street when referring to this roadway.

At this point the detectives Mirandized the defendant, who signed a waiver form and stated that he wished to continue talking. The defendant was also advised of the Lowell Police Department's policy of recording all interviews, but he declined to give his permission for such recording. See Commonwealth v. DiGiambattista, 442 Mass. 423, 447-449, 813 N.E.2d 516 (2004).

This dumpster is not to be confused with the dumpsters behind Pailin City where the victim's clothes were torn off.

Each array included eight photos, and each array was unique, i.e., there was no photo that appeared in both arrays. Although the photos chosen by the victim and by Captain Beane were not identical, the jury could have found that they depicted the same man. Whether the jury could have found that either photo depicted the man in the videos, which did not include close-ups, is an issue we need not resolve.

Both detectives made in-court identifications of the defendant as the man they had interviewed at the police station and who had identified himself in the still photos and videos. The eyewitnesses -- the victim, Captain Beane, and Chea -- were not asked to make in-court identifications.

"When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence, de bene, on the condition that the proof be introduced later. Evidence so admitted is subject to a motion to strike if that proof is not forthcoming." Mass. G. Evid. § 104(b) (2019). If the proof is not introduced, but no such motion is made, the judge is not required to strike the evidence sua sponte, and it may be considered for its full probative value. See Commonwealth v. Sheppard, 313 Mass. 590, 596, 48 N.E.2d 630, cert. denied, 320 U.S. 213, 63 S.Ct. 1450, 87 L.Ed. 1850 (1943) ; Commonwealth v. Salyer, 84 Mass. App. Ct. 346, 355, 996 N.E.2d 488 (2013).

We acknowledge the Supreme Judicial Court's statement in dictum that it "infer[red] that [a] defendant's photograph was in the array, because the array would otherwise be irrelevant." Commonwealth v. Crayton, 470 Mass. 228, 231 n.9, 21 N.E.3d 157 (2014). In Crayton, the array was not admitted in evidence, and the court was not commenting on its admissibility; the court was addressing only the propriety of the defendant's closing argument concerning the array. See ibr.US_Case_Law.Schema.Case_Body:v1">id. Cf. Commonwealth v. Fielding, 94 Mass. App. Ct. 718, 721-722, 119 N.E.3d 328 (2019) (victim identified perpetrator in photo shown to her shortly after offense; photo was admitted at trial without evidence that it depicted defendant).

The defendant also argues for the first time on appeal that the photo array evidence was inadmissible because the Commonwealth "failed to establish the reliability of the photo array procedure," as he claims is required by Commonwealth v. Silva-Santiago, 453 Mass. 782, 906 N.E.2d 299 (2009). But that case concerned a motion to suppress a pretrial identification. See Silva-Santiago, supra at 793-799, 906 N.E.2d 299. On such a motion, it is the defendant's burden to prove "by a preponderance of the evidence that the identification was 'so unnecessarily suggestive and conducive to irreparable misidentification that its admission would deprive the defendant of his right to due process.' " Commonwealth v. Johnson, 473 Mass. 594, 597, 45 N.E.3d 83 (2016), quoting Commonwealth v. Walker, 460 Mass. 590, 599, 953 N.E.2d 195 (2011). The defendant here, never having moved to suppress, is in no position to complain of the absence of affirmative evidence that each of the various protocols discussed in Silva-Santiago and Walker was followed. See Mass. G. Evid. § 1112(b)(1)(A) (2019). The defendant cites nothing in the record indicating that those protocols were not followed, and there was evidence at trial that many of them were. On this record, the defendant has shown no constitutional error in the admission of the photo array evidence.

Both the defendant and the Commonwealth argue that Detective Fenlon's testimony should be understood as opining about the attacker as shown in the Pailin City videos, and we proceed on that basis.

Further, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. The court may order the proponent to produce the underlying documents or records in court." Mass. G. Evid. § 1006. Although videos and digital images are excluded from the definition of "records" in Mass. G. Evid. § 1001(a) (2019), thus excepting such videos and images from the "best evidence rule," Mass. G. Evid. § 1002 note (2019), the defendant offers no reason, and we currently see none, why a summary of video recordings should not be admissible when the conditions of § 1006 are otherwise satisfied. The Federal rules, to which we may look for guidance, see Commonwealth v. Wood, 90 Mass. App. Ct. 271, 277-278, 58 N.E.3d 1056 (2016), expressly provide for the use of a summary of recordings or photographs under conditions essentially identical to those in § 1006. See Fed. R. Evid. 1006 (2011).

We have viewed the underlying videos. A randomly selected jury, unfamiliar with the different file formats and programs involved, would have found it quite cumbersome to locate and view the relevant parts of many of the videos.

The compilation omitted footage showing (1) that the fourth individual behind Pailin City apparently fired several gunshots, and (2) that after the victim and the defendant walked past Crowe Electrical, another man, dressed entirely differently from the defendant, walked past Crowe Electrical on the other side of the street. The jury saw this footage and heard testimony about both individuals, including unobjected-to testimony that the police had checked upon and "cleared" the man near Crowe Electrical.

The defendant's other claims are that the compilation "altered" the timestamp on the Crowe Electrical video, and "dramatically cuts from clips of [the victim] to clips of a man, to suggest he was following her, and that it was indeed [the defendant]."

The 7-Eleven photos showed the defendant wearing dark-colored shorts and wearing a black jacket. This added little to the Commonwealth's case, as the defendant had already admitted to being the man in the Boys and Girls Club videos, who was wearing dark-colored shorts and who had placed a dark-colored jacket on a dumpster. The 7-Eleven photos added nothing to the critical comparison, which was between the Boys and Girls Club video clips and the Pailin City video clips. Moreover, the photos depicted the defendant wearing a dark-colored T-shirt with white lettering, as well as shoes. These items of clothing tended to differentiate him from the victim's description of the attacker.

We do not agree with the defendant's suggestion that the phrase "[o]nly other person in area" was inaccurate. In the context of rest of the timeline, the jury would have understood the phrase to mean the only person shown in the videos as being on foot and not already listed in the timeline.

The defendant also criticizes a timeline entry listing a video clip that showed the man being "[c]leared by police." That clip was shown to the jury, and Detective Fenlon testified without objection that it showed another officer "slow[ing] down to take a look at the person," after which the person was "cleared." Although the timeline could have used a more neutral term to identify the clip, the issue does not significantly affect our analysis.

The defendant couches his argument in terms of departures from the provisional model instruction appended to the decision in Commonwealth v. Gomes, 470 Mass. 352, 22 N.E.3d 897 (2015). That provisional instruction was replaced, before the trial in this case, by the model instructions cited in the text, and thus we use the model instructions as our reference point.

The defendant also argues that the judge erred in omitting the language instructing the jury to consider "the witness's prior familiarity with the person" identified. Model instructions, 473 Mass. at 1054. But that portion of the instructions is to be given only if, unlike here, there is evidence that the witness and the person identified are family members, friends, or longtime acquaintances. Id. The defendant further argues that the judge erred in omitting language directing the jury, in the case of a photo array identification, to consider "whether the person [showing the photographs] ... knew who was the suspect and could have, even inadvertently, influenced the identification." Id. at 1056. The judge did not use this precise language, but she fully covered its substance.

The sentences were as follows: for assault with intent to rape, from twelve to eighteen years in State prison; for assault and battery, two and one-half years in a house of correction, to be served concurrently with the State prison sentence; and for kidnapping and for indecent assault and battery on a person fourteen years of age or older, concurrent terms of probation, to be served from and after the State prison sentence. Although both the judge and the clerk stated at sentencing that the terms of probation were to be five years, the docket reflects probationary terms of three years. The record before us does not explain the discrepancy.

The defendant also claims that the judge may have improperly relied on the prosecutor's statement that the defendant previously had admitted to having "faked ... a mental illness" in order to avoid a prior sentence. Nothing in the judge's comments at sentencing suggests that she relied on this statement.

The power to review an otherwise lawful sentence to State prison "is delegated to the Appellate Division of the Superior Court." Coleman, 390 Mass. at 804, 461 N.E.2d 157, citing G. L. c. 278, §§ 28A -28C. At the time of oral argument in this case, the defendant's appeal to the Appellate Division was pending.

The closest the Legislature has come is to prescribe a minimum mandatory sentence for assault with intent to rape if committed "while armed with a firearm, rifle, shotgun, machine gun or assault weapon." G. L. c. 265, § 24.

While we decide today that the judge's statement of reasons for her decision requires resentencing, we commend the practice of judges explaining their sentencing decisions. This ensures that the parties and the public understand why the judge exercised her discretion in a particular way, which promotes confidence in the integrity of the judicial process. It also assists an appellate court in reviewing, where necessary, issues relating to sentencing. See White, 48 Mass. App. Ct. at 664, 724 N.E.2d 726 (beneficial for judge to "freely place on record [her] sentencing philosophy and particularized sentencing rationale").