SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. LUIS GOMEZ

 
 Docket:
 SJC-13324
 
 
 Dates:
 January 10, 2025 - April 17, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Georges, & Dewar, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Homicide. Evidence, Identification, Videotape, Motive, Opinion, Relevancy and materiality, Hearsay, Rebuttal, Intent, Argument by prosecutor, Inference. Constitutional Law, Fair trial, Assistance of counsel. Due Process of Law, Fair trial. Practice, Criminal, Verdict, Assistance of counsel, Argument by prosecutor, Opening statement, Capital case. Intent.
 
 

       Indictment found and returned in the
Superior Court Department on March 8, 2019.
      The case was tried before Douglas H.
Wilkins, J., and a motion to reduce the verdict, filed on February 1, 2023, was
heard by him.
      Jillise McDonough for the defendant.
      Travis H. Lynch, Assistant District
Attorney, for the Commonwealth.
      GAZIANO, J.  A Superior Court jury convicted the
defendant, Luis Gomez, of deliberately premeditated murder in the first degree
in connection with the shooting death of Jesus Flores at the entrance to a
Springfield nightclub.  At trial, the
primary issue for the jury's determination was the defendant's identification
as the shooter.  To prove identification,
the Commonwealth relied on surveillance video footage from several cameras
inside and outside the nightclub.  The
defendant argued, in part, that the Commonwealth was unable to prove
identification beyond a reasonable doubt due to the poor quality of the
surveillance footage.  After the
conviction, the trial judge reduced the verdict to murder in the second degree
pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995)
(rule 25 [b] [2]), based on a lack of evidence of deliberate premeditation and
lethal intent.  
      The defendant raises three arguments in
this direct appeal.  First, the evidence
introduced at trial was insufficient to support a conviction.  Second, the judge erred in allowing a
compilation videotape (compilation video) in evidence that stitched together
portions of surveillance footage from multiple cameras.  Third, the judge improperly allowed a police
officer to testify to a hearsay statement made by the fatally wounded victim to
rebut a challenge to the adequacy of the police investigation.  Additionally, the Commonwealth appeals from
the reduction of the verdict to murder in the second degree.  
      After a thorough review of the record
under G. L. c. 278, § 33E (§ 33E), and for the following
reasons, we affirm the conviction of murder in the first degree, reverse the
reduction of the verdict as an abuse of discretion, reinstate the jury's verdict,
and remand the matter to the Superior Court for resentencing.  
      1. 
Background.  a.  Facts. 
We recite the facts that the jury could have found, viewed in the light
most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass.
671, 677-678 (1979), reserving some facts for later discussion of particular
issues.  
      On November 3, 2018, the victim's cousin,
Fernando Garcia, hosted a birthday celebration at a Waltham Avenue nightclub in
Springfield.  He posted details about the
event, which featured performances by local musicians, on a social media
site.  The victim, a chef by trade,
provided security as a doorman.  Among
his duties, the victim pat frisked individuals entering the nightclub for
weapons.  
      The nightclub was within a warehouse occupying
most of Waltham Avenue.  A large portion
of the evidence at trial was corroborated through video surveillance recordings
from the interior and exterior of the nightclub, and from three area
businesses.  In addition, the
Commonwealth introduced in evidence video footage of the performers and the
crowd filmed by a Springfield-based photographer.  
      The defendant conceded that he attended
the birthday party.  He was dressed in a
blue pullover hooded sweatshirt with short, thick, white ties on the neckline
tied in a bow.  He also wore a blue
Oklahoma Thunder baseball cap with a reflective sticker visible in the middle
of the brim and white-soled shoes.  The
defendant has an owl tattoo on the left side of his neck, a feature displayed
to the jury at trial.  He was accompanied
by a taller man dressed in a distinctive multicolored red, white, and blue
"USA" windbreaker, and a Chicago Blackhawks baseball cap.  Other partygoers were attired similarly in
sweatshirts, jeans, sneakers, and baseball caps associated with various sports
teams.  
      Prior to the fatal shooting, an
altercation of unknown origin broke out inside the nightclub involving many
partygoers, including the defendant. 
Thereafter, the defendant left the nightclub and hurriedly walked along
Waltham Avenue to a white van parked across the street in front of a four-bay
garage.  He opened the driver's side door
of the van and reached inside to retrieve an item, by inference a firearm, and
walked back to the nightclub at the same fast pace.  
      The nightclub's exterior surveillance
camera recorded the defendant outside the club. 
He stood next to his taller companion at the front entrance.  Holding a handgun in his right hand, he
"racked" the slide to chamber a round of ammunition.  He had been yelling at the victim, who was
positioned at the door blocking entry into the club.  During the exchange, the victim spoke to the
defendant with his hands raised in a conciliatory posture.  The defendant pointed the firearm at the
victim and fired.  After the victim ran
away clutching his abdomen, the defendant and his companion fled on foot,
entered the white van, drove away from the nightclub, and turned onto Wilbraham
Avenue, an adjacent street.  
      Nelson Nieves, who was scheduled to perform
that night, witnessed the shooting.[1] 
He observed the defendant and his taller companion, who was dressed in a
"white, red, and blue windbreaker," outside the front door
entrance.  The victim (whom Nieves
identified as the doorman) closed the door, preventing the two men, who were
screaming at patrons inside the club, from gaining entry.  In addition, the victim attempted to calm the
defendant and his companion to "defuse whatever [the] situation was."  Next, the defendant, brandishing a handgun,
twice repeated the phrase, "What's up?"  According to Nieves, the defendant was
"pissed" and "bugging the fuck out."  The defendant yelled, "What the
fuck?" and "What the fuck is up?" and insisted on fighting.  At some point in the altercation, the
defendant "racked the gun." 
Again, the victim attempted to defuse the situation, telling the gunman,
"Hey man, calm down."  The
defendant asked the victim, "Which car is yours?"  The victim replied, "None of these cars
are mine."  The defendant opened
fire. 
      Focused on the gun, Nieves was unable to
identify the shooter when later interviewed by the police.  He nonetheless described the shooter as a
short man wearing a dark gray sweatshirt. 
One of the officers interviewing Nieves pressed him on this description,
asking, "[A]re you sure about the clothing?"  Nieves responded, "It's dark
gray."  
      The wounded victim, clutching his abdomen,
ran across Waltham Avenue and through a yard to Wilbraham Avenue.  There, he knocked on the passenger's side
window of a car parked on the side of the road. 
The victim, who was clutching his midsection, asked the driver for
help.  Before she could assist, the
victim walked across the street. 
"After a while," a white van sped down Wilbraham Avenue and
struck the car's side mirror.  
      At 10:27 P.M., Springfield police officers
responded to gunfire in the vicinity of Waltham Avenue.  The officers found the victim on a walkway in
front of a Wilbraham Avenue residence. 
He was suffering from two gunshot wounds:  one to his abdomen and the other to his right
knee.  He died ten days later due to
complications from the abdominal gunshot wound. 
The fatal round entered his abdomen two inches right of the midline at
the level of the umbilicus.  It exited on
the left side of the body five and one-half inches from the midline.  The wound path was right to left and slightly
upward.  The gunshot wound to the
victim's knee fractured his patella (kneecap). 

      Police attempted to enter the nightclub
after the shooting.  Blocked by
uncooperative patrons, the officers pepper sprayed the crowd and forced their
way inside.  The officers systematically
identified each of the approximately fifty attendees by checking
identifications and verifying biographical information through a police
database.  The defendant was not present.[2]
      Investigators recovered eight expended .40
caliber cartridge casings outside the nightclub near the front door, and a .40
caliber live round on top of the doormat. 
A ballistics expert testified that moving the slide to the rear to rack
a pistol will eject a previously chambered live round.  Police also found a projectile within the
victim's clothing.  All the expended
casings, as well as the projectile, were fired from the same .40 caliber
firearm.  Police never recovered the
murder weapon.  
      b. 
Prior proceedings.  A grand jury
returned an indictment charging the defendant with murder in the first degree
of Jesus Flores, in violation G. L. c. 265, § 1.  After a nine-day trial, the jury on September
3, 2021, found the defendant guilty of murder in the first degree by deliberate
premeditation.  The trial judge sentenced
the defendant to a mandatory life term in State prison without the possibility
of parole.  The defendant timely noticed
his appeal, and the case was entered in this court on September 14, 2022.  
      On December 16, 2022, the trial judge
issued a "procedural order" directing the parties to brief whether he
had the authority, on his own motion, to consider reduction of the verdict from
murder in the first degree to murder in the second degree, and whether there
was sufficient evidence of intent to kill. 
In response, the defendant filed, pursuant to rule 25 (b) (2),
a motion to set aside the verdict or, in the alternative, reduce the verdict to
murder in the second degree or manslaughter. 
We remanded the case to allow the trial judge to address the issue.  The judge determined that there was evidence
sufficient to support a verdict of murder in the first degree.  He also determined that the weight of the
evidence, although sufficient to support the jury's verdict, pointed to the
lesser crime of murder in the second degree. 
The judge reduced the jury's verdict accordingly and resentenced the
defendant to life with the possibility of parole.  The Commonwealth timely noticed its appeal
from the postconviction order.  
      2. 
Discussion.  a.  Sufficiency of the evidence.  The defendant moved for a required finding of
not guilty at the close of the Commonwealth's case and at the close of all
evidence.  After trial, he moved to set
aside the verdict as against the weight of the evidence.  At each turn, and now on appeal, he has
argued that the Commonwealth failed to introduce sufficient evidence to permit
the jury to find beyond a reasonable doubt that he was the shooter.  
      In determining whether the evidence was
sufficient to sustain a conviction, we consider the evidence in the light most
favorable to the Commonwealth.  Latimore,
378 Mass. at 677.  "A conviction may
rest exclusively on circumstantial evidence, and, in evaluating that evidence,
we draw all reasonable inferences in favor of the Commonwealth."  Commonwealth v. Jones, 477 Mass. 307, 316
(2017).  Inferences "need only be
reasonable and possible and need not be necessary or inescapable."  Commonwealth v. Lao, 443 Mass. 770, 779
(2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011), quoting
Commonwealth v. Longo, 402 Mass. 482, 487 (1988).  "A conviction may not, however, be based
on conjecture or on inference piled upon inference."  Jones, supra. 

      Applying these standards, we conclude that
the evidence was sufficient to permit a rational jury to find, beyond a
reasonable doubt, that the defendant was the shooter.  See Commonwealth v. Coates, 89 Mass. App. Ct.
728, 732 (2016) ("It is not necessary that any one witness should
distinctly swear that the defendant was the [perpetrator], if the result of all
the testimony, on comparison of all its details and particulars, should
identify [the defendant] as the offender" [citation omitted]).  There was no dispute that the defendant
attended the event prior to the shooting. 
Clear color video footage recorded inside the nightclub, as well as
still photographs taken from that footage, depicted the defendant dressed in a blue
pullover hooded sweatshirt with short, thick, white ties on the neckline tied
in a bow.  He also wore a blue Oklahoma
Thunder baseball cap with a reflective sticker visible in the middle of the
brim, and white-soled shoes. 
Accompanying the defendant inside the nightclub was a tall man wearing a
distinctive multicolored red, white, and blue "USA" windbreaker, and
a Chicago Blackhawks baseball cap.  The
video images also depicted the defendant's physical features, such as a stocky
build and shorter height relative to his taller companion.  This evidence, as the judge found, provided
"a solid reference point for comparison with video of the shooter before
and during the shooting."  See
Commonwealth v. Phillips, 495 Mass. 491, 495 (2025) (jury able to observe
defendant sitting in court room and assess points of similarity to videotaped
image of shooter, such as build, posture, and height).  
      We also agree with the judge's
determination that a rational jury could have found that the shooter (shown on the
front door video footage), like the defendant, "was wearing a hat of the
same size and style with a sticker on the brim; a pull-over hoodie with visible
white ties; and shoes with white soles." 
The shooter's white ties, we note, were thick and tied in a bow at the
neckline.  In addition, the front door
video footage depicted the shooter's companion -‑ a taller man relative to the
shooter -- wearing a distinctive multicolored windbreaker.  
      These points of comparison, together with
Nieves's testimony, permitted the jury to track the defendant's movements
inside and outside the nightclub and determine a motive for the killing.  In sum, the defendant and his companion
entered the nightclub after parking the white van on Waltham Avenue.  The defendant appeared to be enjoying
himself; he filmed a performance on his cell phone and spoke to other
partygoers.  Then, he abruptly left the
nightclub following an altercation.  On
leaving, the defendant hurriedly retrieved a firearm from the white van and
returned to the nightclub.  "[T]he
shooter," as the judge observed, "probably had to leave the club and
retrieve the gun from somewhere outside the venue" because the doormen
were patting down the guests for weapons prior to entry.  At the front door, the defendant and his
companion yelled at the victim, who prevented the two men from reentering the
nightclub.  The judge found that the
defendant's hostility was "consistent with the emotions that appeared to
arise from the earlier commotion inside the club."  After the shooting, the defendant and his
companion fled in the white van parked down the street from the nightclub.  When police arrived and secured the
nightclub, the defendant was not among the many remaining patrons.  
      The defendant points to weaknesses in the
Commonwealth's evidence.  For example,
almost every male in the nightclub was wearing a baseball hat bearing a sports
team logo, with a sticker affixed to the brim, and a sweatshirt.  In addition, although the shooter held the
gun in his right hand, the defendant is left-handed.  These discrepancies in the evidence were for
the jury to resolve.  See Commonwealth v.
Clary, 388 Mass. 583, 588-589 (1983).  
      b. 
Compilation video.  Michael
Riggins, a Springfield police department civilian employee, created a
thirteen-minute compilation video from surveillance footage introduced in
evidence.  To do so, he examined footage
recorded before and after the shooting from the interior and exterior of the
nightclub, the photographer, and three area businesses.  Riggins testified that he focused on
"certain items of clothing," without elaboration.  He then placed a location marker (a red
circle) in several portions of the compilation video around the entire body of
"individuals that we were looking at."[3]  In addition, Riggins decreased the playback
speed of the footage depicting the shooting and enlarged the images of the
shooting.  
      The defendant objected to the introduction
of the compilation video.  Before trial,
he filed a motion in limine to preclude the introduction of lay opinion
identification testimony, contending that "[t]he Commonwealth now seeks to
elicit testimony from [the lead detective] and/or Mr. Riggins relating to their
opinions and conclusions about the person they opine is the defendant in the
gray scale surveillance videos." 
This testimony, the defendant maintained, "would usurp the role of
the jury" to determine whether the defendant appeared to be the same
person depicted in the video recordings. 
Prior to Riggins's testimony, the defendant asked the judge to exclude
the compilation video.  He asserted that
this court, in Commonwealth v. Wardsworth, 482 Mass. 454, 476 (2019), and
Commonwealth v. Davis, 487 Mass. 448, 469 (2021), S.C., 491 Mass. 1011 (2023),
"made it quite clear that opinion evidence is not admissible in these
circumstances when the [j]ury has the video themselves, and they can make their
own judgments."[4]
      After confirming that the Commonwealth's
witnesses would not testify to a "match" and stressing that "the
jury will have to draw its own conclusion," the judge overruled the
defendant's objection to the introduction of the compilation video.  It was permissible, he ruled, to invite the
jury to compare the defendant to the individual in the video, "but not
[to] draw[] the conclusion that it's a match."  The judge further determined that the
overlayed red circles in portions of the compilation video were permissible,
observing that the red circles function as "the electronic version"
of a witness wielding an old-fashioned wooden pointing stick.  He determined that the prosecutor was
entitled to ask the jury to focus on relevant images in the video
recordings.  
      On appeal, the defendant contends that the
judge abused his discretion in admitting the compilation video because it
"usurped the function of the jury" in violation of his Federal and
State constitutionally protected due process and fair trial rights.  Because the defendant objected to the admission
of the compilation video as impermissible lay opinion evidence, we review the
judge's evidentiary ruling for prejudicial error resulting from an abuse of
discretion.  See Commonwealth v. Pina,
481 Mass. 413, 429 (2019); L.L. v. Commonwealth, 470 Mass. 169, 185 n.27
(2014). 
      The identification of an individual from a
photograph or video image is an expression of lay opinion.  Pina, 481 Mass. at 429, citing Commonwealth
v. Pleas, 49 Mass. App. Ct. 321, 323-324 (2000).  A witness may offer an opinion concerning the
identity of someone on a video recording "when the witness possesses
sufficiently relevant familiarity with the defendant that the jury cannot also
possess" (citation omitted). 
Commonwealth v. Vacher, 469 Mass. 425, 441 (2014).  See Mass. G. Evid. § 701 note
(2024) (witness's opinion concerning identity of person depicted on videotape
admissible only where witness is more likely than jury to identify person
correctly from videotape).  Without such
a foundation, lay opinion identification is improper, as it usurps the jury's
ability to draw their own conclusions regarding the identity of the individual
depicted on videotape.  Wardsworth, 482
Mass. at 475.  
      Here, there was no error because no
witness identified the defendant as the shooter depicted in the compilation
video.  Riggins explained that he
compiled surveillance footage from different cameras and then placed location
markers on "individuals that we were looking at" based on
"certain items of clothing." 
Importantly, he neither described these items of clothing to the jury nor
used the compilation video to compare items of clothing in the images of the
shooter to those undisputably worn by the defendant.  This testimony stands in contrast to the
evidence before the court in Wardsworth, 482 Mass. at 474.  In Wardsworth, a detective opined that a
person shown in the surveillance video was dressed "similar[ly]" to
the defendant, and a second detective not only opined that the defendant's
attire "was a definitive match to that of what [he] saw in the video
earlier in the evening," but also concluded that the defendant
"appeared to be the same person from the video."  Id. at 474-475.  The Commonwealth also introduced
"photographs of the defendant, with arrows pointing to the 'points of
comparison [a detective] used when looking at the video."  Id. 
See Commonwealth v. Robertson, 489 Mass. 226, 236-237, cert. denied, 143
S. Ct. 498 (2022) (witness arguably strayed "too close to the
line" of improper lay opinion by testifying to "looking for similar
features," such as tattoos when comparing defendant's photograph to image
of suspect).  
      Moreover, before the compilation video was
played for the jury, the judge provided a thorough limiting instruction on its
proper use:
"It's up to
you to figure out whether this is helpful to you, not helpful to you, whether
it is a different way to put it together, and you're going to be asked to look
at things for comparison purposes.  The
witness has no idea what happened that night. 
He has no personal knowledge, no ability better than you to decide.  So it's up to you, ultimately, to decide.
. . .  [A]re the comparisons
worthwhile?  Are they not worthwhile?  Are they wrong?  Are they right?  It's completely your decision, and you should
not defer in any way to this witness on that. 
He's just drawing your attention to certain things."  
      Accordingly, the judge did not abuse his
discretion in denying the defendant's challenge to the compilation video as
inadmissible lay opinion evidence.  
      The defendant also challenges the admissibility
of the compilation video on the grounds that the manner in which the video was
presented "created an unfair cognitive bias that would have improperly
influenced the jury and usurped their function."  He raises three related arguments.  First, the prosecutor's opening statement
"primed the jury" to identify the defendant by drawing their
attention to the similarities in the articles of clothing worn by the defendant
and the shooter.  Second, the prosecutor's
description of the video images in his closing argument "was essentially
an additional lay opinion that [the defendant] was the shooter."  Third, the Commonwealth unfairly added its
own "gloss" to the compilation video by inserting red circles around
the person claimed to be the defendant. 
Because the defendant raises these arguments for the first time on
appeal, we review under the substantial likelihood of a miscarriage of justice
standard.  See Commonwealth v. Morales,
483 Mass. 676, 677 (2019).
      The prosecutor's opening statement and
closing argument did not exceed the bounds of propriety.  In the opening statement, the prosecutor
stated that Riggins  
"was able to
stitch together a compilation of film footage that follows the shooter by the
use of various markers.  Markers from
head to toe, literally, side to side. 
Markers that include on the shooter a distinctive hat, a bright
reflective sticker on the brim of that hat, of a hoodie[,] to the soles of his
shoes[,] to the laces tied tight at the neck of that hoodie."   
Further, the prosecutor
urged the jury, in summation, to identify the defendant as the shooter by
following the "footprints on the screen."  Referring to the compilation video, he
argued:  
"Michael
Riggins . . . compiled it.  The
markers are front and center.  The footsteps
are plain and easy to follow.  I suggest
to you again that if you follow the [ties] on the sweatshirt, you follow the
sticker on the hat, you follow the shoes, you follow the sidekick, and follow
the van, . . . they are going to take you directly to this man, [the
defendant], before you."  
The defendant, as
mentioned, did not object to the prosecutor's opening statement or this portion
of the closing argument.  
      The lack of an objection to either is
understandable.  A prosecutor, in an
opening statement, is entitled to state what he or she "expects to be able
to prove or support by evidence" (citation omitted).  Commonwealth v.
Kapaia, 490 Mass. 787, 794 (2022).  That is precisely what the prosecutor
did here; the evidence previewed by the prosecutor in his opening statement
mirrored the actual evidence at trial.  A prosecutor in a closing argument
may argue forcefully for a conviction based on the facts in evidence and the
reasonable inferences drawn from those facts. 
Commonwealth v. Rutherford, 476 Mass. 639, 643 (2017).  In this case, the prosecutor did not stray
over the line by asking the jury to draw a reasonable inference of the
defendant's identity from the video images introduced in evidence.  
      Further, the opening statement and closing
arguments did not constitute impermissible lay opinion evidence because the
arguments of counsel are not evidence. 
See Commonwealth v. Silanskas, 433 Mass. 678, 691 (2001).  Indeed, prior to opening statements, the
judge instructed the jury that opening statements and closing arguments are not
a substitute for evidence.  Likewise, in
the final charge, the judge reminded the jury that the statements and arguments
of counsel are not evidence.  He also
informed the jury:  "You must
determine the facts solely and entirely on the evidence as you've heard it and
seen it in this court room and nothing else."  The jury are presumed to follow the judge's
instructions.  Commonwealth v. Lora, 494
Mass. 235, 254 (2024).  
      We conclude also that the Commonwealth's
introduction of the compilation video with red circles directing the jury to
focus on the alleged assailant did not create a substantial likelihood of a
miscarriage of justice.  There is no
dispute that the compilation video was authenticated properly as a subset of
surveillance video footage "that had already been admitted in
evidence."  Commonwealth v. Sosa,
493 Mass. 104, 114-115 (2023), cert. denied, 145 S. Ct. 306 (2024).  See Commonwealth v. Souza, 494 Mass. 705, 720
(2024) (defendant not prejudiced where component parts of compilation exhibit
were already admitted in evidence); Commonwealth v. Chin, 97 Mass. App. Ct.
188, 201-205 (2020) (requiring authentication as condition precedent to
admissibility of compilation video).  Nor
did the brief enlargement of images and slow-motion playback (lasting
approximately thirty seconds) appear to be "digitally altered to depict
events that were different from those depicted in the complete
footage."  Sosa, supra at 115.  Moreover, any risk of prejudice to the
defendant from the "gloss" added by the overlayed red circle markers
was mitigated by the judge's exemplary instruction to the jury.  See Commonwealth v. Francis, 104 Mass. App.
Ct. 593, 605 (2024) (risk of prejudice from argumentative captions in
compilation video mitigated by judge's limiting instruction).  
      Finally, we reject the defendant's
comparison of the compilation video to the exhibit found unduly prejudicial in
Commonwealth v. Wood, 90 Mass. App. Ct. 271, 276-277 (2016).  The exhibit in Wood, a "PowerPoint"
digital slide presentation, functioned as a mini-closing argument by including
cell phone records, condensed versions of text messages among the defendant,
victim, and third party, call logs, and maps depicting the victim's movements
based on global positioning system tracking data.  Id. at 275-276.  In this case, the red circles appeared on
screen for a relatively brief portion of the thirteen-minute video.  There were no side-by-side comparisons of the
defendant's cap, sweatshirt ties, or soles of shoes, or the companion's
multicolored windbreaker.  
      c. 
Victim's statement.  The wounded
victim told a responding police officer that he was shot by a man "wearing
a blue shirt and blue hat."  Ten
days later, the victim died of complications from the gunshot wound to the
abdomen.  Before trial, the Commonwealth
filed a motion in limine to admit the victim's statement to the officer as a
dying declaration.  After conducting a
voir dire examination of the officer and considering medical testimony, the
judge ruled that the statement was not admissible as a dying declaration.  He found that the Commonwealth failed to
establish that the victim believed his death imminent when he made the statement.  See Commonwealth v. Middlemiss, 465 Mass.
627, 632 (2013); Mass. G. Evid. § 804(b)(2).  
      In the alternative, the Commonwealth
argued that the statement was admissible to rebut the defendant's challenge to
the adequacy of the police investigation (Bowden defense).  See Commonwealth v. Bowden, 379 Mass. 472,
485-486 (1980).  According to the
prosecutor, the defendant raised the issue in his opening statement when
counsel claimed that the police "ignored" Nieves's description of the
shooter as wearing a dark gray sweatshirt, and instead focused on a suspect
dressed in a blue sweatshirt.  The judge
allowed the Commonwealth's motion.  He
explained that it would be "unfair for the Commonwealth to be hamstrung
and not explain[] why it was reasonable for them to proceed against a suspect
who was allegedly wearing a royal blue sweatshirt."  
      The judge also declined to exclude the
statement after balancing the probative value of the evidence against its
potential prejudicial effect.  See Mass.
G. Evid. § 403.  He reasoned that
the probative value "is important because there has been a question raised
about whether the Springfield [p]olice had information from Mr. Nieves that
they should have followed up on, and explains why they may not have followed up
on that in the way the defense argues they should have."  The comparative prejudice was minimal, he
found, "given that the [j]ury ultimately is going to have to resolve the
issue [of identification] based on the video." 
      On appeal, the defendant raises two
claims.  He argues, as he did at trial,
that the judge erred in admitting the victim's statement because there was no
Bowden challenge to the police investigation for the Commonwealth to rebut,
given that an opening statement is not evidence.  We review this issue for prejudicial error.  See Pina, 481 Mass. at 429.  Next, he contends that, if trial counsel
opened the door to such rebuttable evidence, counsel rendered constitutionally
ineffective assistance.  We review this
issue, raised for the first time on appeal, for a substantial likelihood of a
miscarriage of justice.  See Commonwealth
v. Brown, 462 Mass. 620, 629 (2012).  
      In his opening statement, defense counsel
stated that the police ignored evidence from the only eyewitness, Nieves, who
was standing "a few feet away."  "Mr. Nieves told the Springfield [p]olice
that the shooter was wearing a dark gray sweatshirt.  Dark gray sweatshirt.  He said it repeatedly.  The detectives repeatedly tried to get Mr.
Nieves to change his description . . . and he wouldn't budge."  The Commonwealth introduced Nieves's police
interview in evidence.  Thereafter, on
cross-examination of Nieves, the defendant emphasized Nieves's description of
the shooter as wearing a gray sweatshirt by introducing two photographs in
evidence.  The first photograph depicted
the defendant inside the nightclub accompanied by his companion, labeled by
Nieves as the "[y]elling" man. 
The second photograph depicted Nieves standing a few feet away from the
person Nieves labeled as man number one (the shooter) and the person Nieves
labeled as man number two (yelling man). 
Both men, numbered one and two, were positioned at the entrance to the
nightclub prior to the shooting.  The
exhibits emphasize the point made by defense counsel in the opening statement
-- that Nieves had the opportunity to observe the shooting from a few feet away
and, despite his proximity to the shooter, told police that the shooter wore a
dark gray sweatshirt.  
      The permissible scope of rebuttal evidence
to counter a Bowden defense "depends, in part, on the issues raised by the
defense."  Commonwealth v. Colon,
482 Mass. 162, 187 (2019).  A statement
by defense counsel in his opening, the Commonwealth acknowledges, "does
not necessarily open the door to [rebuttal] evidence."  Here, the judge determined that the defendant
raised the Bowden defense in his opening statement and in the cross-examination
of Nieves.  He found that defense counsel
"delivered" on his promise to the jury "when [defense counsel]
admitted the photographs that Mr. Nieves had identified in his
statement."  Based on this evidence,
it was within the judge's discretion to allow the Commonwealth to explain why
investigators focused on an individual wearing a blue sweatshirt, not a dark
gray sweatshirt.  
      Recasting the argument as an ineffective
assistance of counsel challenge fares no better.  "[A]n ineffective assistance of counsel
challenge made on the trial record alone is the weakest form of such a
challenge because it is bereft of any explanation by trial counsel for his
actions and suggestive of strategy contrived by a defendant viewing the case
with hindsight."  Commonwealth v.
Peloquin, 437 Mass. 204, 210 n.5 (2002). 
See Commonwealth v. Davis, 481 Mass. 210, 222 (2019) ("The
preferred method for raising claims of ineffective assistance of trial counsel
is through a motion for a new trial"). 
It may be resolved on direct review in "exceptional"
circumstances where the factual basis of the claim appears indisputably on the
trial record.  Commonwealth v. Zinser, 446
Mass. 807, 810-811 (2006).  The
defendant's disagreement with trial counsel's apparent tactical decision to
argue that the police neglected to follow a lead provided by the only
eyewitness does not support an ineffective assistance claim.  See Commonwealth v. Kolenovic, 471 Mass. 664,
673 (2015), S.C., 478 Mass. 189 (2017) (deference is owed to counsel's tactical
decisions "to avoid characterizing as unreasonable a defense that was
merely unsuccessful" [citation omitted]). 

      d. 
Reduction of the verdict.  We next
consider the Commonwealth's appeal from the judge's decision, pursuant to rule
25 (b) (2), to reduce the verdict from murder in the first degree on a theory
of deliberate premeditation to murder in the second degree.  We review for abuse of discretion or other
error of law.  Commonwealth v. Rogers,
494 Mass. 629, 647-648 (2024).  Deference
is owed to the trial judge, who had the "advantage of face to face evaluation
of the witnesses and the evidence" (citation omitted).  Commonwealth v. Reavis, 465 Mass. 875, 891
(2013).  At the same time, the
responsibility of maintaining "some measure of regulation and
uniformity" in rule 25 (b) (2) decision-making lies with this court.  Commonwealth v. Gaulden, 383 Mass. 543, 554
(1981).  
      A trial judge has the authority, under
rule 25 (b) (2), to reduce a verdict to a lesser degree of guilt "despite
the presence of sufficient evidence to support the jury's verdict."  Commonwealth v. Chhim, 447 Mass. 370, 381
(2006).  See G. L. c. 278,
§ 11; Commonwealth v. Sanchez, 485 Mass. 491, 504-505 (2020).  A judge is not limited to viewing the
evidence in the light most favorable to the Commonwealth, and instead may
consider the over-all weight of the evidence, including the defendant's version
of the facts.  Chhim, supra at
382-383.  "[T]he purpose of the
power to reduce a verdict is to ensure that the result in every criminal case
is consonant with justice" (quotation and citation omitted).  Id. at 381. 
"In deciding whether to reduce a jury verdict to a finding of
guilty of a lesser offense, a trial judge, acting under rule
25 (b) (2), should be guided by the same considerations that have
guided this court in the exercise of its powers and duties under § 33E to
reduce a verdict."  Gaulden, 383
Mass. at 555.  We have repeatedly
emphasized that rule 25 (b) (2) authority should be used "sparingly"
in a manner that does not diminish the role of the jury in our criminal justice
system.  See Chhim, supra, and cases cited.  See also Commonwealth v. Pfeiffer, 492 Mass.
440, 446 (2023).  The judge does not sit
as a second jury.  See id., and cases
cited.  
      This court, for example, upheld a trial
judge's decision to reduce a verdict of murder in the first degree to murder in
the second degree where the evidence of premeditation was "slim,"
with little evidence of motive. 
Commonwealth v. Ghee, 414 Mass. 313, 322 (1993).  We have also upheld a judge's decision to
reduce a verdict of murder in the second degree to involuntary manslaughter
based on weakness in the evidence of criminal intent and the presence of
cognitive limitations that impaired the defendant's ability to comprehend the
consequences of her actions.  Pfeiffer,
492 Mass. at 456-457.  See Chhim, 447
Mass. at 382, 384 (no abuse of discretion in reducing verdict of murder in
first degree to manslaughter based on defendant's limited and passive role in
joint venture); Commonwealth v. Millyan, 399 Mass. 171, 188-189 (1987) (no
abuse of discretion in reducing verdict of murder in first degree to murder in
second degree where evidence of intoxication undermined theory of deliberate
premeditation).  
      On the other hand, "[a] reduction to
a lesser verdict is not justified when it would be inconsistent with the weight
of the evidence or is based solely on factors irrelevant to the level of
offense proved" (quotations and citation omitted).  Sanchez, 485 Mass. at 505.  In Commonwealth v. Lyons, 444 Mass. 289,
292-293, 297 (2005), for example, we reversed a judge's decision to reduce a
conviction of murder in the second degree to involuntary manslaughter where the
stated reasons, including that the defendant's crime was a "momentary act
of 'extraordinarily poor judgment,'" did not indicate an absence of
malice.  See Rogers, 494 Mass. at 649-650
(reversing reduction of murder conviction where motion judge considered
defendant's sentence and change in felony-murder jurisprudence that applied
only prospectively).  
      Here, the judge reduced the verdict to
murder in the second degree because, in his view, "the weight of the
evidence did not prove that [the defendant] acted with premeditation and
intended to kill [the victim]."[5] 
Rather, he determined that the evidence supported an inference of
"unfocused rage or an intent to scare or injure" the victim.  In support of that determination, he first
pointed out that although the defendant fired eight rounds at the victim from
close range, only two hit their mark. 
Moreover, one of the two rounds struck the victim in the knee, which
reflected an intent to aim "away from the parts of the body associated
with fatal wounds."  And the other
round, he stated, "entered the victim's abdomen at an extreme angle . . .
most consistent with haphazard shooting." 
The judge concluded that "[t]he physical evidence . . . thus fails
to support the notion that apart from [the] simple fact of using a gun, the
shooter, with premeditation, intended to kill [the victim]."
      Second, the judge emphasized that the
sequence of events failed to support the Commonwealth's argument that the defendant's
retrieval of a firearm from the white van and subsequent return to the
nightclub demonstrated premeditation or an intent to kill the victim.  "Those preparatory actions warranted an
inference that [the defendant] intended to use the gun to threaten, harm or
kill someone in the group inside the club that [he] opposed."  As a result, the judge stated, "[the
defendant's] intent to use the gun on opponents inside the club actually
supports the conclusion that he was trying to scare the doorman and others
outside the club. . . . 
He simply needed them to get out of his way so that he could confront
his true opponents."[6]
      On our careful review of the evidence, we
disagree with the judge's conclusion that the weight of the evidence pointed to
"unfocused rage or an intent to scare or injure" the victim.  As a threshold matter, the judge drew an
unreasonable inference about the defendant's intent from the angle of the
entrance wound.  He acknowledged that the
defendant stood "almost directly in front of [the victim]," but found
that the "extreme" angle of the fatal gunshot wound was "most
consistent with haphazard shooting" (emphasis added).  Notably, the victim was positioned at an
angle relative to the defendant during the shooting, the victim visibly jerked
away from the volley of gunfire, and there is no evidence sequencing the eight
gunshots and two gunshot wounds.  As
such, the angle of the fatal entrance wound provides a shaky foundation for
drawing an inference of haphazard shooting. 

      Moreover, firing eight rounds at a person
at close range ordinarily warrants an inference in the other direction:  namely, of an intent to kill.  In Commonwealth v. Colas, 486 Mass. 831,
842-843 (2021), quoting Model Jury Instructions on Homicide 105 (2018), we
observed that the reasonableness of an inference of intent to kill from the use
of a dangerous weapon depends upon "the nature of the dangerous weapon and
the manner of its use." 
"'[T]he manner of its use' logically implies that a defendant used
the dangerous weapon to attack another person, i.e., fired a gun, stabbed with
a knife, or clubbed someone with a baseball bat."  Colas, supra at 843.  An inference of intent to kill, we held, did
not apply where the defendant pointed a handgun at a rival without firing.  Id.  By
contrast, in Commonwealth v. Reaves, 434 Mass. 383, 390 (2001), we concluded
that the Commonwealth established the defendant's intent to kill from
inaccurate gunshots fired in the direction of a hostile group at
"reasonably close range."  See
Commonwealth v. Tejada, 484 Mass. 1, 5, cert. denied, 141 S. Ct. 441
(2020) ("the use of a firearm at close range provides strong evidence of
an intent to kill"); Commonwealth v. Sylvester, 35 Mass. App. Ct. 906,
906-907 (1993) (firing "burst" of four to five rounds, resulting in
hit to victim's knee, supported inference of intended "mortal
harm").  In this case, the defendant
shot the victim two times from a few feet away. 
One shot blew off the victim's kneecap; the other shot struck the victim
in the center mass of his body.  The
facts, therefore, suggest "strong evidence" of intent to kill.  Tejada, supra.  
      We also disagree with the conclusion that
the weight of the evidence -- including evidence that the victim may not have
been the defendant's original target -- points away from deliberate
premeditation.  It is true that many of
our decisions relating to retrieval of a weapon involve settling a score, and
the defendant here had no dispute with the victim until after he returned from
the van.  See, e.g., Commonwealth v. Yat
Fung Ng, 491 Mass. 247, 277 (2023); Commonwealth v. Whipple, 377 Mass. 709, 715
(1979).  In any event, the defendant
brought the firearm to the nightclub "with a violent or vengeful
purpose" as opposed to the weapon being "present fortuitously, an
instrument not of design but of opportunity."  Commonwealth v. King, 374 Mass. 501, 506-507
(1978).  See, e.g., Commonwealth v.
Keough, 385 Mass. 314, 320 (1982) (defendant stabbed victim with knife he
carried to use at work).  The difference
in this case is that the defendant redirected his anger toward an innocent,
unarmed person.  See Commonwealth v.
Rodriquez, 461 Mass. 100, 111-112 (2011) (deadly confrontation fueled by
animus).  That he newly decided to kill
the individual blocking entrance to the nightclub does not support the judge's
finding that the weight of the evidence demonstrated "unfocused rage"
or an intent merely to scare or injure. 
      Finally, we examine "whether the jury
verdict is markedly inconsistent with verdicts returned in similar
cases."  Gaulden, 383 Mass. at
556.  See Pfeiffer, 492 Mass. at 446
(trial judge guided by same considerations as those that drive § 33E review).  In Commonwealth v. Colleran, 452 Mass. 417,
431-432 (2008), we set forth a number of factors to determine whether a
defendant's conviction of murder in the first degree based on deliberate
premeditation should be reduced in the interests of justice pursuant to
§ 33E.  See Yat Fung Ng, 491 Mass.
at 272-273; Commonwealth v. Fernandez, 480 Mass. 334, 345 (2018).  The list is not exhaustive, and each case
depends on its particular facts.  Yat
Fung Ng, supra at 273.  Colleran, supra
at 432.  Specifically, the court
considers (1) "whether the intent to kill was formed in the heat of a sudden
affray or combat"; (2) "whether the homicide occurred in the
course of a senseless brawl"; (3) "whether a minor controversy
exploded into the killing of a human being"; (4) "whether the entire
sequence reflects spontaneity rather than premeditation"; (5)
"whether the defendant carried a weapon to the scene or left the scene
after an initial confrontation and returned with a weapon to kill the
victim"; (6) "whether the victim was the first aggressor"; (7)
"whether the defendant and the victim were strangers"; (8) whether
drugs, alcohol, or mental illness were involved; and (9) "the personal
characteristics of the defendant" (quotations, citations, and alterations
omitted).  Id. at 431-432.  
      Weighing in the defendant's favor, this
case is an example of a senseless act of violence where a (seemingly)
"minor controversy between strangers exploded into the killing of a human
being."  Keough, 385 Mass. at
320.  See Commonwealth v. Tavares, 385
Mass. 140, 157-159, cert. denied, 457 U.S. 1137 (1982).  In addition, the fact that the defendant and
victim were strangers also weighs in the defendant's favor.  Colleran, 452 Mass. at 431.  There are many countervailing factors in the
present case, however, that point toward murder in the first degree.  This is not a case of "uncontrolled
anger and violent action on the part of both the defendant and the
decedent" (citation omitted). 
Commonwealth v. Anderson, 396 Mass. 306, 317 (1985).  See Commonwealth v. Gonsalves, 488 Mass. 827,
845-846 (2022); Fernandez, 480 Mass. at 345. 
There was no senseless brawl or sudden combat, because the victim
attempted to defuse a volatile situation with an armed gunman without resort to
violence.  Cf. Keough, supra at 320-321
(victim initiated fight); Commonwealth v. Jones, 366 Mass. 805, 806, 809 (1975)
(victim struck defendant and pulled out razor). 

      We also conclude that deficiencies in the
evidence of deliberate premeditation do not merit reduction of the verdict in
the interests of justice.  To be sure,
this was not the strongest case of deliberate premeditation.  The defendant's intent to kill the person
blocking entrance to the nightclub occurred in a few seconds, "after only
momentary thought."  See
Commonwealth v. Gomes, 443 Mass. 502, 510 (2005).  See also Fernandez, 480 Mass. at 344
("The law recognizes that a plan to murder may be formed within a few
seconds" [citation omitted]).  The
incident, however, did not "reflect[] spontaneity rather than
premeditation" (citation omitted). 
Colleran, 452 Mass. at 431.  In Colleran,
the court exercised § 33E authority to reduce a conviction of murder in
the first degree to murder in the second degree, concluding that a mother's
strangulation and suffocation of her two and one-half year old daughter was an
inexplicably impulsive act brought about by the defendant's mental
illness.  Id. at 433-434.  By contrast, here, the Commonwealth
established that the defendant was angered by the victim's refusal to allow
entry into the nightclub, racked his pistol to ensure that his handgun was
ready to shoot, argued with the victim, rebuffed the victim's repeated attempts
to deescalate the situation, and finally fired multiple gunshots at the victim
from close range, striking him twice. 
See Commonwealth v. Chipman, 418 Mass. 262, 269 (1994) (sequence of
thought process rather than amount of time is "key to determining whether
someone acted with deliberate premeditation").
      Furthermore, there was nothing to suggest
that evidence of premeditation was diminished by mental illness, intoxication,
or other mitigating circumstances.  See
Commonwealth v. Salazar, 481 Mass. 105, 119-120 (2018) (reducing verdict of
murder in first degree to murder in second degree under § 33E where
evidence of deliberate premeditation was "far from compelling" and
issue of intoxication was "incompletely presented as a defense");
Commonwealth v. Pagan, 471 Mass. 537, 543-546, cert. denied, 577 U.S. 1013
(2015) (affirming trial judge's decision to reduce verdict of murder in first
degree to murder in second degree as more consonant with justice given
"weak" evidence of premeditation in combination with "compelling
and uncontroverted testimony regarding the defendant's youth, adolescent brain,
untreated [mental impairment], and troubled childhood"); Millyan, 399
Mass. at 189-190 (affirming trial judge's decision to reduce verdict to murder
in second degree where "judge seemed satisfied that Millyan was
sufficiently intoxicated that he was unable to premeditate and
deliberate"); Commonwealth v. Lanoue, 392 Mass. 583, 591-592 (1984)
(reducing verdict to murder in second degree under § 33E where evidence of
premeditation was "thin" and "judge's charge concerning the
effect of intoxication on the defendant's capacity for deliberate premeditation
was somewhat deficient in light of the substantial evidence of
intoxication").  
      It was, therefore, an abuse of discretion
to reduce the verdict, in the circumstances presented in this case, as against
the weight of the evidence of a deliberately premeditated murder.   
      3. 
Conclusion.  We affirm the
defendant's conviction of murder in the first degree.  The order allowing the defendant's motion to
reduce the verdict is reversed, and the conviction of murder in the first
degree is reinstated.  The matter is
remanded to the Superior Court for resentencing.
So ordered.

footnotes

[1] Nieves
testified that he was unable to recall the events of November 3, 2018, or his
subsequent videotaped police interview. 
The recorded interview was entered in evidence without objection.  See Mass. G. Evid. § 803(5)(A)
(2024).  

[2] The front
door was the only means of entry and egress at the nightclub.  

[3] The red
circles appear in seven brief segments (ranging from a few seconds to less than
one minute) of the thirteen-minute compilation video.  The red circle drew focus on (1) the
defendant and his companion exiting the white van parked on Waltham Avenue; (2)
the defendant moving the white van to the opposite side of the street; (3) the
confrontation inside the nightclub; (4) the defendant leaving the club headed
in the direction of the white van; (5) the defendant's walk toward the white
van on Waltham Avenue; (6) the shooting; and (7) the defendant and his
companion fleeing the crime scene in the white van. 

[4] In Davis, 487
Mass. at 469, we held that it was unreasonable for the Commonwealth to ask the
jury to identify the defendant where the video "is not high enough
resolution and is taken from too far away to be able to discern any features of
the shooter's face."  This was not
an issue in this case.  The Commonwealth
did not argue that the jury could identify the defendant in images of the
shooting from the exterior video of the front door.  

[5] In assessing
whether the verdict was consonant with justice, under rule 25 (b) (2), the
judge noted that the defendant contested his identification as the shooter, and
as a result, the jury "did not have the benefit of a developed
presentation on the appropriate degree of murder if [they] found that [the
defendant] was the shooter."    

[6] The judge also found that the defendant's
flight from the scene "reduce[d] the possibility that [he] intended to
kill [the victim]."  The front door
video, he noted, "does not show that, after [the victim] ran away, the
shooter pursued him."  Also, the
white van sped away on Wilbraham Avenue but did not "slow[] or stop[] to
attack the victim further."  Under
this reasoning, the Commonwealth's evidence of intent to kill was diminished
because the defendant did not track the wounded victim down and finish him
off.  We disagree with this speculative
conclusion.  The judge discounted the
possibility that the defendant prioritized his escape after having shot the
victim in front of several witnesses.  In
addition, there is no evidence that the defendant observed the victim, who was
dressed in dark clothing and collapsed on the ground in front of a residence,
as he recklessly sped away on Wilbraham Avenue.